# IN THE SUPREME COURT OF IOWA

No. 11–0892

Filed February 15, 2013

**KIMBERLY ANN SALLEE,** Individually and as Next Friend
of **LUCAS GREGORY DURKOP** and **MARIA CHRISTINA RIVERA,**
**MATTHEW JAMES SALLEE,** and **JAMES ALLAN SALLEE,**

Appellants,

vs.

**MATTHEW R. STEWART** and **DIANA STEWART**
d/b/a **STEWARTLAND HOLSTEINS,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Fayette County, Margaret L. Lingreen, Judge.

The owners of a dairy farm seek further review of a decision of the court of appeals, reversing a district court's grant of summary judgment to them in a personal injury case based on the statutory recreational use immunity. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED, AND CASE REMANDED.**

D. Raymond Walton of Beecher Law Offices, Waterloo, for appellants.

Karla J. Shea of McCoy, Riley, Shea & Bevel, P.L.C., Waterloo, for appellees.

Michael L. Mock of Parker, Simons & McNeill, P.L.C., West Des Moines, for amicus curiae Iowa Farm Bureau Federation.

3

**APPEL, Justice.**

While accompanying kindergarten students on a field trip to a dairy farm, a chaperone was injured when she fell through a hole in the floor of a hayloft. The chaperone filed a negligence suit against the dairy farm's owners. The district court granted summary judgment in favor of the owners on the basis that Iowa's recreational use statute barred the chaperone's claims. The court of appeals affirmed on the issue of whether recreational use immunity extended to the defendants as landowners, but determined the chaperone could still maintain a suit against the defendants as tour guides.

For the reasons that follow, we conclude the landowners may not avail themselves of the limited protections of the recreational use statute because the chaperone was not engaged in a recreational purpose within the scope of the statute. We further conclude, however, that the plaintiff has not raised a material issue of triable fact as to whether the landowners willfully or maliciously failed to guard or warn against the presence of the hole. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for further proceedings.

## I. Factual and Procedural Background.

A reasonable fact finder viewing the summary judgment record in the light most favorable to Kimberly Ann Sallee, the nonmoving party, could find the following facts. Matthew and Diana Stewart own a dairy farm in Fayette County. Although the Stewarts do not routinely open their farm to the public, classes or individuals wishing to view the farm can schedule a visit. These groups are always accompanied by a member of the Stewart family. If visitors arrive at the farm without a

scheduled appointment, they are only permitted to tour the farm if accompanied by the Stewarts.[1]

The kindergarteners from the Sacred Heart School have been annual visitors for a number of years. During their visit, the students learn about the typical day on a farm. The students are usually chaperoned by their teacher, a few parents, and at least one member of the Stewart family. The Stewarts do not permit the students to go into cattle pens or other places where the Stewarts believe the students might be in danger.

On May 18, 2010, Sallee accompanied her daughter's Sacred Heart kindergarten class on a tour of the Stewarts' farm. As with other visits to the farm, the field trip was scheduled in advance. The Stewarts accompanied the students during their visit and set up three stations for the students. At one station, the students rode a horse in a round pen. At another, the students could feed a calf with a bottle of milk. At the third station, the students could view a tractor. Matthew supervised the entire process, and adults were positioned at each station. Once they had rotated through each station, the students saw several cows and a bull. The Stewarts then guided the group to the barn to allow the students to play in the hayloft.

Matthew asked Sallee and another chaperone to climb into the hayloft ahead of the students so that they could assist the students at the top of the ladder. After Sallee looked at the ladder, Matthew reassured her it was stable enough to support her weight. Sallee followed the other chaperone up the ladder and into the hayloft. The children, another chaperone, the teacher, and Matthew followed.

---

[1]There is no indication the Stewarts posted "No Trespassing" signs.

Matthew advised Sallee to keep the students away from the hole in the floor where the ladder was located and warned the students not to climb too high on the bales of hay piled to one side of the loft. While in the hayloft, the children ran around and climbed on the hay bales.

The Stewarts never advised Sallee as to the presence of several hay drops, rectangular holes in the floor of the hayloft through which hay can be thrown to the animals below. Ordinarily, the Stewarts stack bales of hay across the holes when they are not in use to insulate the lower part of the barn. Prior to the class's arrival, Matthew inspected the hayloft and stood on the bales of hay covering the holes to make sure they would support his weight. However, while Sallee was standing on top of a bale covering one of the holes, the bale gave way. Sallee fell through the hole, breaking her wrist and leg.

Sallee filed suit against the Stewarts, alleging their negligence caused her injuries. The Stewarts asserted as an affirmative defense that Iowa Code chapter 461C (2009), Iowa's recreational use statute, shielded them from liability. The Stewarts later moved for summary judgment based on the recreational use statute. In resistance to the Stewarts' motion, Sallee argued the recreational use statute does not apply as a matter of law because the dairy farm, barn, and hayloft did not fall under the definition of "land" in the statute, the farm was not available to the public, the tour of the farm was not a "recreational purpose" within the meaning of the statute, and Sallee, as a chaperone, was not engaged in a recreational purpose. In the alternative, Sallee argued that the Stewarts willfully failed to guard or warn against the presence of the hay drop and that the Stewarts were liable not as owners of the property, but rather as tour guides.

The district court concluded the recreational use statute barred Sallee's claim. The court reasoned that the Stewarts farm was land within the meaning of the statute. It also found that, while on the farm, the students engaged in horseback riding and nature study, defining terms of "recreational purpose." Thus, it concluded that Sallee was a recreational user because she was "a chaperone of children's activities, which included horseback riding, nature study, and play in the Stewarts' hayloft." Finally, the court found that the Stewarts had not willfully failed to guard or warn against the hay drop and that they had not acted recklessly.

Sallee appealed, and we transferred the case to the court of appeals. A majority agreed with the district court that the Stewarts' property was covered by the recreational use statute. It also found that Sallee was engaged in a recreational purpose. It reasoned that, based on the language of the statute, the legislature intended an expansive definition of "recreational purpose" which encompassed Sallee's role as a chaperone because the students had engaged in horseback riding, nature study, and play during their visit to the farm. It also determined the Stewarts had not willfully or maliciously failed to guard or warn against a dangerous condition, use, structure, or activity. However, the majority found that recreational use immunity did not extend to the Stewarts "once they undertook responsibility for guiding the field trip attendees." One judge on the panel dissented from the majority's holding on the premises liability issue on the grounds that Sallee was not engaged in any recreational purpose under the statute because she was present to ensure the proper behavior of the students as a chaperone, not to engage in any recreational activity.

We granted the Stewarts' application for further review.

## II. Standard of Review.

We review the district court's grant of summary judgment for correction of errors at law. *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). Summary judgment is only appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "An issue is 'material' only when the dispute is over facts that might affect the outcome of the suit, given the applicable governing law." *Junkins v. Branstad*, 421 N.W.2d 130, 132 (Iowa 1988). The burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law. *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005). We view the evidence in the light most favorable to the nonmoving party. *Id.*

## III. Background of Recreational Use Statutes.

## A. Development of Recreational Use Statutes.

1. *Conflicting interests of public safety and increased access to the Great Outdoors.* At common law, the extent of a landlord's duty to an individual injured after entering the land typically depended upon the injured party's status as a trespasser, licensee, or invitee. *Koenig v. Koenig*, 766 N.W.2d 635, 638 (Iowa 2009). The duty owed to a trespasser was generally limited to avoiding willfully or wantonly careless conduct; the duty owed to a licensee generally included refraining from willful or wanton conduct as well as a duty to warn of hazardous conditions; and the duty owed to an invitee generally included the duties owed to a licensee as well as duties to make the premises safe, to inspect the property for dangerous conditions, and to either repair or warn the invitee of such conditions. *See* W.L. Church, *Private Lands and Public Recreation: A Report and Proposed New Model Act on Access, Liability and*

*Trespass* 7–8 (1979) [hereinafter Church]. We have recognized these distinctions in our cases. *See Koenig*, 766 N.W.2d at 638; *Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602, 604 (Iowa 1998), *abrogated on other grounds by Koenig*, 766 N.W.2d at 643–45. Potential liability was a disincentive for landowners to make their lands available to the public for recreational purposes.

Following World War II, the demand for access to land for outdoor recreational purposes was increasing, but at the same time the amount of land for such purposes was decreasing as the public also demanded more infrastructure, such as "subdivisions, industrial sites, highways, schools, and airports." Outdoor Recreation Resources Review Commission, *Outdoor Recreation for America: A Report to the President and to the Congress by the Outdoor Recreation Resources Review Commission* 1 (1962) [hereinafter ORRRC Report]. Further, as Americans became increasingly obese, public health advocates sought to expand the recreational opportunities available to Americans. *See* Michael S. Carroll et al., *Recreational User Statutes and Landowner Immunity: A Comparison of State Legislation*, 17 J. Legal Aspects of Sport 163, 163, 178 (2007) [hereinafter Carroll]. Legislatures responded by considering measures that would lessen somewhat the exposure of landowners to liability to persons entering their land for recreational purposes while still providing a degree of protection to the public. *See* Comment, *Wisconsin's Recreational Use Statute: A Critical Analysis*, 66 Marq. L. Rev. 312, 316 (1983) [hereinafter *Wisconsin's Recreational Use Statute*] (describing recreational use statutes as a " 'tradeoff' whereby the landowner is relieved of certain tort liabilities when he gratuitously allows members of the public recreational access to his land").

The literature describing and supporting modification of the common law to promote public recreational use on private land generally focuses on the needs of sportspersons engaged in hunting, fishing, hiking, and similar activities taking place in the Great Outdoors. *See, e.g.*, Tommy L. Brown, *Analysis of Limited Liability Recreation Use Statutes in the Northern Forest States* 1 (Cornell Univ. Dep't of Natural Res., October 2006), *available at* http://www.dnr.cornell.edu/hdru (noting that in addition to hunting and fishing "access to private lands has become increasingly important . . . for trails for hiking, snowmobiling, cross-country skiing, and use of all terrain vehicles"); John D. Copeland, *Recreational Access to Private Lands: Liability Problems and Solutions* 6 (Nat'l Agricultural Law Ctr., 2d ed. 1998) [hereinafter Copeland] ("An increasingly urbanized population is in need of wider access to lands providing wilderness or rural experiences."); Ronald A. Kaiser & Brett A. Wright, *Liability and Immunity: A National Assessment of Landowner Risk for Recreational Injuries* iii (USDA Soil Conservation Serv. 1992) ("Vast increases in the use of public lands for recreational use have led to more frequent requests by the recreating public to gain access to private, rural lands for purposes of hunting, fishing, and other outdoor activities."); Debra Wolf Goldstein, *The Recreation Use of Land and Water Act:* Lory v. City of Philadelphia, 35 Duq. L. Rev. 783, 785 (1997) (pointing out that state recreational use laws provide a means of "making open space lands available to the public" in place of the government's acquisition of lands); *Wisconsin's Recreational Use Statute,* 66 Marq. L. Rev. at 315 (noting that as of 1983, forty-three states had adopted recreational use statutes to "limit the liability of landowners whose lands are used for recreational purposes such as hunting, fishing and sightseeing"); Note, *Torts—Statutes—*

*Liability of Landowner to Persons Entering for Recreational Purposes*, 1964 Wis. L. Rev. 705, 705 (1964) [hereinafter *Liability of Landowner to Persons Entering for Recreational Purposes*] (noting that Wisconsin was the tenth state to adopt a statute aimed at "encouraging public recreational use of privately owned forest and farm lands").

2. *Early recreational use statutes in the Midwest.* Michigan and Wisconsin were the first Midwestern states to enact recreational use statutes.[2] *See Liability of Landowner to Persons Entering for Recreational Purposes*, 1964 Wis. L. Rev. at 705 & n.2. These statutes were aimed at promoting traditional outdoor recreation and limiting the liability of landowners who opened their lands for public use. For example, Michigan's recreational use statute as enacted in 1953 stated,

> "No cause of action shall arise for injuries to any person who is on the lands of another without paying to such other a valuable consideration *for the purpose of fishing, hunting or trapping,* with or without permission, against the owner, tenant or lessee of said premises unless the injuries were caused by the gross negligence or wilful and wanton misconduct of the owner, tenant or lessee."

*Wymer v. Homes*, 412 N.W.2d 213, 217 (Mich. 1987) (quoting 1953 Mich. Pub. Acts 201 (emphasis added)), *overruled by Neal v. Wilkes*, 685 N.W.2d 648 (Mich. 2004). Although the Michigan legislation as originally proposed in 1953 applied only to hunting, the Michigan legislature amended it to include fishing and trapping before passage later that year. *See id.* The Michigan statute was further amended in 1964 to include "camping, hiking, sightseeing, or other similar outdoor recreational use." *Id.*

---

[2]The states that had enacted recreational use statutes by 1964 were Maine, Michigan, Minnesota, New Hampshire, New York, Ohio, Pennsylvania, Tennessee, Virginia, and Wisconsin. Note, *Torts—Statutes—Liability of Landowner to Persons Entering for Recreational Purposes*, 1964 Wis. L. Rev. 705, 705 & n.2 (1964).

Wisconsin enacted its recreational use statute in 1963. The act was originally promoted by owners of timberlands who wanted to invite deer hunters onto their lands to prevent damage brought about by excessive deer herds, but who feared tort liability stemming from injuries suffered by the invitees. *Goodson v. City of Racine*, 213 N.W.2d 16, 18–19 (Wis. 1973); *see also Liability of Landowner to Persons Entering for Recreational Purposes*, 1964 Wis. L. Rev. at 709. The Wisconsin statute applied to "hunting, fishing, trapping, camping, hiking, berry picking, water sports, sightseeing, or recreational purposes." Wis. Stat. § 29.68 (1963).

The benefit of these early recreational use statutes was recognized by the Outdoor Recreation Resources Review Commission (ORRRC) in its report published in 1962. Established by Congress in 1958, the ORRRC conducted an extensive nationwide study of outdoor recreation, which resulted in a report entitled *Outdoor Recreation for America: A Report to the President and to the Congress. See* ORRRC Report at 1–2. The report declares, "This report is a study of outdoor recreation in America—its history, its place in current American life, and its future. *Id.* at 1. The ORRRC's report indicated that as of 1962 Americans sought a variety of outdoor pursuits, including pleasure driving, walking, boating, swimming, fishing, bicycling, sightseeing, skiing, mountain climbing, picnicking, and skindiving. *Id.* at 25–26. It estimated that three-quarters of Americans would live in urban areas by the year 2000 and noted that urban dwellers would have the greatest need for (and least supply of) outdoor recreation facilities. *Id.* at 3. More importantly, the ORRRC predicted the nation's demand for outdoor recreation resources would nearly triple by the turn of the century. *Id.* at 32. The ORRRC

made a number of recommendations for the federal and state governments, one of which was the development of a national outdoor recreation policy and the creation of a Bureau of Outdoor Recreation within the Department of the Interior to provide leadership in meeting the demands of outdoor recreation. *Id.* at 6–7, 121–26. The ORRRC suggested the states "encourage the public use of private lands by taking the lead in working out such arrangements as leases for hunting and fishing, scenic easements, and providing protection for landowners who allow the public to use their lands."[3] *See id.* at 9.

3. *1965 model act.* A few years after publication of *Outdoor Recreation for America*, the Council of State Governments proposed a model act relating to recreational use, the suggested title of which was "An act to encourage landowners to make land and water areas available to the public by limiting liability in connection therewith." *See* Council of State Governments, *Public Recreation on Private Lands: Limitations on Liability*, 24 Suggested State Legislation 150, 150 (1965) [hereinafter Council of State Governments]. At the time, less than one-third of the states had enacted recreational use statutes. *Id.* The Council of State Governments recognized the lack of public outdoor recreational space and that a solution was to encourage private landowners to open their land to the public. *Id.* The preface to the 1965 model act stated:

> Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor

_____

[3]In addition to its report, the ORRRC published a series of studies. The titles not surprisingly demonstrate an abiding focus on outdoor recreation. The titles of the studies include *Public Outdoor Recreation Areas—Acreage, Use, Potential*; *List of Public Outdoor Recreation Areas–1960*; *Wilderness and Recreation—A Report on Resources, Values, and Problems*; *Shoreline Recreation Resources of the United States*; *The Quality of Outdoor Recreation: As Evidence by User Satisfaction*; and *Hunting in the United States—Its Present and Future Role.*" *See* Charles Zinser, *Outdoor Recreation: United States National Parks, Forests, and Public Lands* 37 (1995).

recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. Where the owners of private land suitable for recreational use make it available on a business basis, there may be little reason to treat such owners and the facilities they provide in any way different from that customary for operators of private enterprises. However, in those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.

*Id.* As indicated in the preface, the need was for additional recreational areas "to serve the general public." While public land was being acquired by government, "large acreages of private land could add to the outdoor recreation resources available." *Id.* Thus, the Council of State Governments proposed that the public recreational resources of the government should be supplemented by large acreages of private lands for purposes of outdoor recreation.

Section 1 of the 1965 model act declared that its general purpose was "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." *Id.* This first section is consistent with the preface, emphasizing that land and water resources should be made available to the public.

Section 2(c) of the 1965 model act defined "recreational purpose" under the act. It provided:

> "Recreational purpose" *includes, but is not limited to,* any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic or scientific sites.

*Id.* at 151 (emphasis added). Section 3 of the 1965 model act provided a landowner owed "no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises" to persons who entered the landowner's land for recreational purposes. *Id.*

The 1965 model act did not provide complete immunity to landowners against claims of persons entering the land for recreational purposes. Section 6(a) provided that the statutory immunity would not extend to injuries caused by "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." *Id.* Similarly, section 6(b) provided that protection would not extend to landowners who charged recreational users a fee for access to their lands. *Id.*

4. *1979 proposed model act.* After roughly a decade of experience under the 1965 model act, advocates of outdoor recreation—the National Association of Conservation Districts, the International Association of Fish and Wildlife Agencies, the National Rifle Association, the National Wildlife Federation, and the Wildlife Management Institute—commissioned University of Wisconsin law professor William L. Church to conduct a study of the use of private lands for recreational purposes. *See* Church at 3; *see also* Stuart J. Ford, Comment, *Wisconsin's Recreational Use Statute: Toward Sharpening the Picture at the Edges,* 1991 Wis. L. Rev. 491, 499 & n.31 (1991) [hereinafter Ford] (referring to the investigation's sponsors as "a coalition of sporting and environmental groups"). Professor Church concluded that the 1965 model act was

generally too protective of recreational users and that this in turn caused landowners to refrain from opening land to the public for recreational use. *See* Church at 10–13. Professor Church also found the 1965 model act complex and unpredictable. *Id.* This was, in part, due to confusion purportedly caused by the definition of "recreational purpose." *Id.* at 11. To cure these perceived deficiencies, Professor Church drafted what is generally referred to as the 1979 proposed model act. *See id.* at 29–33.

Among other things, the 1979 proposed model act provided that " '[r]ecreational use' means any activity undertaken for exercise, education, relaxation, or pleasure on land owned by another." *Id.* at 29 (section 2(3)). The 1979 proposed model act also allowed owners to collect certain fee-like benefits from recreational users, included government entities in the definition of "owners" under the statute, and limited potential premises liability claims of recreational users to malicious acts or omissions by owners. *Id.* at 29–30 (sections 2(2), 2(4) and 5(1)).

5. *Advocacy of outdoor recreation in the 1980s and 1990s.* In the 1980s and 1990s, there were a number of important meetings related to improving outdoor recreational access as well as a growth of literature relating to recreational use statutes. In 1987, the President's Commission on Americans Outdoors issued a lengthy report emphasizing the desirability of more outdoor recreational opportunities for Americans. *See* President's Commission on Americans Outdoors, *Americans Outdoors: The Legacy, the Challenge, with Case Studies* 13–15 (Island Press 1987). With respect to recreational use statutes, the report noted that roughly forty-six states had statutes protecting private landowners when they provided "free public access" to their property for recreational use. *Id.* at 202. The report suggested expansion of recreational use

statutes to include within their scope not just recreational users but "volunteers" apparently associated with recreational use. *Id.* at 213.

In 1990, a conference featuring participants from twenty-nine states and the District of Columbia promoted the need to obtain more public access to private land. *See Proceedings from the Conference on: Income Opportunities for the Private Landowner Through Management of Natural Resources and Recreational Access* i, 3 (William N. Grafton et al. eds., 1990). A unifying theme of this meeting, consistent with the available literature, is a repeated emphasis on increasing access to outdoor recreation for members of the public. *See id.* at 3. The conference sought to instruct private landowners as to the potential profitability of opening their lands for a fee and potential liability associated with doing so. *See id.* at 60, 341–80. In particular, one commentator noted that "[r]ecreational use statutes are intended to encourage owners of private land to allow the public to enter without charge for recreational purposes such as hiking, exploring caves, swimming and other such activities." *Id.* at 370.

In 1999, an assessment of outdoor recreation was published pursuant to the Forest and Rangeland Renewable Resources Planning Act of 1974. *See* H. Ken Cordell et al., *Outdoor Recreation in America: A National Assessment of Demand and Supply Trends* vii (Susan M. McKinney ed., 1999). In a chapter entitled "Private Lands and Outdoor Recreation in the United States," the report noted that "increasing demand for *outdoor* recreation in America brings into play the question of liability." *Id.* at 184 (emphasis added).

**B. Definitions of "Recreational Purpose" in Recreational Use Statutes.** Currently, all states have some kind of recreational use statute. While there is considerable variety in the recreational use

statutes, the statutes fall into a number of general categories with respect to the manner in which they define "recreational purpose." These include statutes that define "recreational purpose" using the "includes, but is not limited to" language of the 1965 model act followed by a list of activities. Other statutes are patterned after the 1979 proposed model act. Some statutes are hybrids and contain expansive catchall provisions in addition to a list of activities. Finally, others take a more restrictive approach.

1. *Recreational use statutes with a definition of recreational use patterned after the 1965 model act.* Many states have recreational use statutes that define "recreational purpose" using a list that "includes but is not limited to" a number of specific outdoor activities. The list of activities specifically identified in the statutes varies from state to state, but usually includes the activities identified in the 1965 model act with the addition of other activities, such as spelunking, hot air ballooning, gleaning, mushing, and hang gliding. *See* Ala. Code § 35–15–21(3) (LexisNexis 1991); Ark. Code Ann. § 18–11–302(5) (Supp. 2011); Conn. Gen. Stat. Ann. § 52–557f(4) (West Supp. 2012); Del. Code Ann. tit. 7, § 5902(4) (2011); Fla. Stat. Ann. § 375.251(5)(b) (West Supp. 2013); Ga. Code Ann. § 51–3–21(4) (West 2003 & Supp. 2012); Haw. Rev. Stat. § 520–2 (2006); Idaho Code Ann. § 36–1604(b)(4) (2011); Kan. Stat. Ann § 58–3202(c) (2005); Ky. Rev. Stat. Ann. § 411.190(1)(c) (LexisNexis 2005); La. Rev. Stat. Ann. § 9:2795(A)(3) (2009); Me. Rev. Stat. Ann. tit. 14, § 159–A(1)(B) (Supp. 2012); Minn. Stat. Ann. § 604A.21(5) (West 2010); Miss. Code Ann. § 89–2–3 (West 1999); Neb. Rev. Stat. § 37–729(3) (2008); Nev. Rev. Stat. § 41.510(4) (2011); Okla. Stat. tit. 76 § 10.1(2)(b) (2011); Or. Rev. Stat. Ann. § 105.672(5) (West Supp. 2012); 68 Pa. Cons. Stat. Ann. § 477–2(3) (Supp. 2012); R.I. Gen. Laws § 32–6–2(4) (Supp.

2012); S.C. Code Ann. § 27–3–20(c) (2007); Utah Code Ann. § 57–14–2(3) (LexisNexis Supp. 2012); Wash. Rev. Code Ann. § 4.24.210(1) (West Supp. 2013); W. Va. Code Ann. § 19–25–5(5) (LexisNexis Supp. 2012); Wyo. Stat. Ann. § 34–19–101(a)(iii) (2011); *see also* Cal. Civil Code § 846 (West 2007).

A number of courts have pointed to "includes, but is not limited to" language to support expansive interpretations of recreational use statutes. *See, e.g., Anderson v. Atlanta Comm. for the Olympic Games, Inc.*, 537 S.E.2d 345, 348 (Ga. 2000) (interpreting the "includes, but is not limited to" language of the Georgia statute to mean that the statute encompasses any recreational activity); *Jacobsen v. City of Rathdrum*, 766 P.2d 736, 743 (Idaho 1988) (finding that a child who was "playing" had a recreational purpose even though such activity was not expressly listed); *Richard v. La. Newpack Shrimp Co.*, 82 So. 3d 541, 546 (La. Ct. App. 2011) (holding the omnibus clause incorporated loading a boat and preparing for departure into the statute even though they were not expressly listed). California's statute is slightly different in that it states, "A 'recreational purpose,' as used in this section, *includes such activities as . . . .*" Cal. Civil Code § 846 (emphasis added). It has, however, been interpreted expansively because it uses a term of enlargement followed by a list of activities, *see Ornelas v. Randolph*, 847 P.2d 560, 563 (Cal. 1993) (holding that playing on farm equipment is a recreational purpose within the meaning of the statute even though not specifically listed), and is therefore similar to those statutes using the "includes, but is not limited to" language of the 1965 model act.

2. *Statutes that incorporate the expansive language of the 1979 proposed model act.* Some statutes use expansive general language to define "recreational purpose." These statutes appear to be modeled

directly after the 1979 proposed model act. *See* N.C. Gen. Stat. § 38A–2(5) (2012) (" 'Recreational purpose' means any activity undertaken for recreation, exercise, education, relaxation, refreshment, diversion, or pleasure."); N.D. Cent. Code § 53–08–02 (2012) (" 'Recreational purposes' includes any activity engaged in for the purpose of exercise, relaxation, pleasure, or education."). Similarly, prior to an amendment in 2005, the Illinois recreational use statute, which also applies to conservation purposes, defined " 'recreational or conservation purpose' " as " 'any activity undertaken for conservation, resource management, exercise, education, relaxation, or pleasure on land owned by another.' "[4] *See Hall v. Henn*, 802 N.E.2d 797, 799 (Ill. 2003) (quoting 745 Ill. Comp. Stat. Ann. 65/2(c) (West 2002)); *see also* 2005 Ill. Laws ch. 70, para. 32 (amending this definition to include only hunting and recreational shooting).

As expected, courts have interpreted these statutes broadly. *See, e.g.*, *Vaughn v. Barton*, 933 N.E.2d 355, 363 (Ill. App. Ct. 2010) (holding the pre-2005-amendment Illinois statute applied to playing baseball and watching baseball); *Olson v. Bismarck Parks & Recreation Dist.*, 642 N.W.2d 864, 871 (N.D. 2002) (holding that winter sledding is a recreational purpose under the North Dakota statute). As the Illinois Supreme Court put it, " 'Exercise, education, relaxation, or pleasure' encompasses just about every purpose, absent commerce, for which a

---

[4]Prior to 1987, the Illinois definition of "recreational purpose" was markedly different. It stated,

" 'Recreational purpose' *includes, and is limited to*, any of the following, or any combination thereof: hunting, fishing, swimming, boating, snowmobiling, motorcycling, camping, picnicking, hiking, cave exploring, nature study, water skiing, water sports, bicycling, horseback riding, and viewing or enjoying historical, archaeological, scenic or scientific sites."

*Lane v. Titchenel*, 562 N.E.2d 1194, 1197 (Ill. App. Ct. 1990) (quoting the 1985 version of the definition).

person is invited onto another's property." *Hall*, 802 N.E.2d at 800. Maryland, interestingly, has chosen to define "recreational purpose" as encompassing "any recreational pursuit," a definition that may be broader than that of the 1979 proposed model act. *See* Md. Code Ann., Nat. Res. § 5–1101(f) (LexisNexis 2012).[5]

3. *Recreational use statutes with a definition of "recreational purpose" containing expansive catchall provisions.* Several states have departed from the 1965 model act by providing catchall language in the definition of recreational purpose. These statutes are essentially hybrids of the 1965 model act and the 1979 proposed model act in that they define "recreational purpose" using a list of activities coupled with a catchall provision. Some of these states simply provide that the statute includes "other recreational activities," an approach that may be criticized as circular. *See* Colo. Rev. Stat. § 33–41–102(5) (2012) ("or other recreational activity"); Ind. Code Ann. § 14–22–10–2(d) (LexisNexis 2003) ("for the purpose of swimming, camping, hiking, sightseeing, or any other purpose"); Mich. Comp. Laws Ann. § 324.73301 (West 2009) ("or any other outdoor recreational use or trail use"); Mont. Code Ann. § 70–16–301 (2011) ("or other pleasure expeditions"); N.J. Stat. Ann. § 2A:42A–2 (West 2010) ("and any other outdoor sport"); N.M. Stat. Ann. § 17–4–7 (2012) ("or any other recreational use"); Va. Code Ann. § 29.1–509(B) (2011) ("for any other recreational use"); *see also* Ariz. Rev. Stat. Ann. § 33-1551(c)(5) (Supp. 2012) (defining "recreational user" as one who may "engage in other outdoor recreational pursuits" in addition to other enumerated activities); Ohio Rev. Code Ann. § 1533.18(B)

---

[5]This is in stark contrast to a former version of Maryland's statute, which stated, " 'Recreational purpose' includes the following or any combination thereof . . ." and did not include a catchall provision. *See* 1973 Md. Laws, 1st Extra. Sess., 827.

(LexisNexis Supp. 2012) (defining "recreational user" as one who engaged in certain enumerated activities "or to engage in other recreational pursuits"). In addition, the Colorado statute uses the "includes, but is not limited to" language of the 1965 model act. *See* Colo. Rev. Stat. 33–41–102(5); *see also* Mont. Code Ann. § 70–16–301 (indicating that the definition "includes" certain activities).

In particular, Indiana courts have focused on the "or any other purpose" language to hold that the Indiana statute applies when a land user engages in certain activities that are not enumerated. *See Cunningham v. Bakker Produce, Inc.*, 712 N.E.2d 1002, 1006 (Ind. Ct. App. 1999) (baseball); *McCormick v. State*, 673 N.E.2d 829, 833–34 (Ind. Ct. App. 1996) (boating); *Kelly v. Ladywood Apartments*, 622 N.E.2d 1044, 1048 (Ind. Ct. App. 1993) (sledding). But, the Indiana Supreme Court also held that a high school student who decorated an abandoned grain elevator and participated in a haunted house performance was not engaged in a recreational activity because those activities were inconsistent with the outdoor activities specifically mentioned in the statute, which included hunting, fishing, swimming, trapping, camping, hiking, and sightseeing. *Drake ex rel. Drake v. Mitchell Cmty. Sch.*, 649 N.E.2d 1027, 1030 (Ind. 1995).

4. *Recreational use statutes that list recreational uses, but do not include expansive language.* Unlike the statutes identified above, a very small number of states comprise a fourth category with a more restrictive approach to defining "recreational purpose." These states' recreational use statutes list outdoor activities that qualify as recreational uses, but do not contain the "includes, but is not limited to" language of the 1965 model act or the more expansive definitional language of the 1979 proposed model act. For example, New York's statute provides that "an

owner, lessee or occupant of premises . . . owes no duty to keep the premises safe for entry or use by others for [specified recreational activities]." N.Y. Gen. Obligations Law § 9–103 (McKinney's 2010). The New York Court of Appeals has interpreted this to mean that the land user must be engaged in one of the enumerated activities. *Bragg v. Genesee Cnty. Agric. Soc'y*, 644 N.E.2d 1013, 1016 (N.Y. 1994). As will be explained below, Iowa's statute takes a restrictive approach similar to New York's.

Illinois has taken an even more restrictive approach. Although its recreational use statute originally defined "recreational purpose" using the "includes, but is not limited to" language of the 1965 model act and later included the sweeping definitional language of the 1979 proposed model act, the Illinois legislature severely restricted the statute in 2005 by amending it to apply only to "hunting or recreational shooting." *See* 2005 Ill. Laws ch. 70, para. 32.

### IV. Iowa's Recreational Use Act.

The Iowa recreational use statute was enacted in 1967, two years after publication of the 1965 model act. *See* 1967 Iowa Acts ch. 149. Although the legislature based the statute on the 1965 model act, the legislature made important alterations prior to its enactment that are relevant to our decision today.

The recreational use act was proposed as H.F. 151 and entitled according to the suggestion of the 1965 model act as "[a]n Act to encourage landowners to make land and water available to the public by limiting liability in connection therewith." H.F. 151, 62d G.A., Reg. Sess. (Iowa 1967); *see also* Council of State Governments, 24 Suggested State Legislation at 150. The text and explanation of H.F. 151 as originally proposed were substantially the same as the text and preface of the 1965

model act. *Compare* H.F. 151, *with* Council of State Governments, 24 Suggested State Legislation at 150–52. *See also City of Cedar Rapids v. James Props., Inc.,* 701 N.W.2d 673, 677 (Iowa 2005) ("We give weight to explanations attached to bills as indications of legislative intent."). H.F. 151 spelled out a need to encourage private landowners to make their lands available by defining any potential liability. H.F. 151, explanation. As the legislature explained, "Recent years in Iowa have shown a growing need for additional recreational areas for use by our citizenry." *Id.*; *accord Scott v. Wright,* 486 N.W.2d 40, 42 (Iowa 1992). It further pointed to the roughly one-third of other states that had already passed recreational use laws because it was unreasonable to expect private landowners to risk liability to persons from whom they would receive no compensation in return. H.F. 151, explanation. It stands to reason, therefore, that the legislature modeled the recreational use statute after the 1965 model act. *Peterson v. Schwertley,* 460 N.W.2d 469, 470 (Iowa 1990).

Although the original proposed definition of "recreational purpose" in H.F. 151 was identical to the definition in the 1965 model act, *compare* H.F. 151 § 2(3), *with* Council of State Governments, 24 Suggested State Legislation at 151 (section 2(c)), the legislature adopted two important amendments prior to enactment. One amendment struck the words "includes, but is not limited to, any of" and inserted in lieu thereof the word "means." Another amendment added "while going to and from or actually engaged therein" to the end of the 1965 model act's definition. Thus, the enacted definition of "recreational purposes" read as follows:

> "Recreational purpose" *means the following or any combination thereof*: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study,

water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites while going to and from or actually engaged therein.

1967 Iowa Acts ch. 149, § 2 (emphasis added). From these amendments we can conclude the legislature considered and deliberately rejected the expansive "includes, but is not limited to" language of the 1965 model act defining "recreational purpose," choosing instead a definition consisting of a closed universe of terms. *See* 2B Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 52:5, at 370 (rev. 7th ed. 2012) (noting that ordinarily "when a legislature models a statute after a uniform act, but does not adopt particular language, courts conclude the omission was 'deliberate' or 'intentional,' and that the legislature rejected a particular policy of the uniform act").

Over the years, the legislature has amended this definition various times. In 1971, the legislature added "horseback riding," "motorcycling," "snowmobiling," and "other summer . . . sports." 1971 Iowa Acts chs. 129–30. In 1988, the legislature amended the statute to include "trapping." 1988 Iowa Acts ch. 1216, § 46. Finally, in 2012, although subsequent to the incident giving rise to the issue in this case, the legislature amended the statute to include "all-terrain vehicle riding." 2012 Iowa Acts ch. 1100, § 58.[6]

---

[6]The legislature also made Iowa's recreational use statute applicable to activities involving "urban deer control." *See* 2006 Iowa Acts ch. 1121. The legislature added these provisions much in the same way that Arizona and Maryland made their statutes applicable to educational activities and South Dakota made its statute applicable to agritourism activities in addition to recreational activities. *Compare* Iowa Code § 461C.1 (2009), *with* Ariz. Rev. Stat. Ann. § 33–1551(A) (Supp. 2012), Md. Code Ann., Nat. Res. § 5–1102(a) (LexisNexis 2012), *and* S.D. Codified Laws 20–9–13 (Supp. 2012). Each of these statutes applies to limit landowner liability to persons engaged in these activities in addition to limiting landowner liability to persons engaged in recreational activities and provides separate definitions for each. *See* Ariz. Rev. Stat. Ann. § 33–1551(C)(1), (5); Iowa Code § 461C.2(5), (6); Md. Code Ann., Nat. Res. § 5–1101(c), (f); S.D. Codified Laws 20–9–12(3), (4).

Notably, the legislature never added the "includes, but is not limited to" language of the 1965 model act as roughly half of the other states have done. Similarly, it never added a catchall provision, such as those contained in the definitions of Arizona, Colorado, Indiana, Michigan, Montana, New Jersey, New Mexico, Ohio, and Virginia. Further, the Iowa legislature has not adopted the expansive definition of "recreational purpose" from the 1979 proposed model act as in North Carolina and North Dakota.

Instead, Iowa's statute provides that " '[r]ecreational purpose' *means the following or any combination thereof*," just as it has since its enactment. Iowa Code § 461C.2(5) (2009) (emphasis added). By doing so, the Iowa legislature created a closed universe of outdoor activities that trigger the protections of the statute. The legislature has thus determined that if some other activity beyond those specifically listed is to be considered a recreational purpose, legislative action is required. This is demonstrated by the legislature's decision to add specific terms to the definition over the years. Given the closed nature of the definition of "recreational purposes" under the statute, horseback riding, snowmobiling, other summer sports, trapping, and all-terrain vehicle riding would not have been within the scope of Iowa's recreational use statute absent legislative action.

## V.  State Court Interpretation of Recreational Use Statutes.

A review of cases demonstrates that most state courts have construed recreational use statutes to achieve the legislative purpose of opening lands for outdoor recreation. *See* Jim Butler, *Outdoor Sports and Torts: An Analysis of Utah's Recreational Use Act*, 1988 Utah L. Rev. 47, 65–66 (1988). The question in these cases is not so much whether the statute should be limited to achieve its purposes, but rather what

kind of limitation should be adopted. Regardless of the type of limitation, the purpose of limitation is clear: to avoid the absurd result identified by the plaintiff in this case, namely, that the recreational use statute applies to an urban dweller's barbecue party or a basketball game in the driveway of a suburban home.

**A. General Limitations on the Reach of Recreational Use Statutes.**

1. *Generally open to the public.* One approach to limit the scope of a recreational use statute is to require landowners to make their land open to the public generally in order to be entitled to immunity. In the often cited case of *Gibson v. Keith,* the Delaware Supreme Court held that Delaware's statute applied only to landowners who invite or permit without charge the public at large to use property for recreational purposes. 492 A.2d 241, 248 (Del. 1985); *see also Herring v. Hauck,* 165 S.E.2d 198, 199 (Ga. Ct. App. 1968); *Hughes v. Quarve & Anderson, Co.,* 338 N.W.2d 422, 427 (Minn. 1983); *Estate of Gordon-Couture v. Brown,* 876 A.2d 196, 202 (N.H. 2005); *Loyer v. Buchholz,* 526 N.E.2d 300, 302 & n.1 (Ohio 1988); *Hanley v. State,* 837 A.2d 707, 713–14 (R.I. 2003); *Perrine v. Kennecott Mining Corp.,* 911 P.2d 1290, 1293 (Utah 1996); *Cregan v. Fourth Mem'l Church,* 285 P.3d 860, 863–64 (Wash. 2012); *LePoidevin v. Wilson,* 330 N.W.2d 555, 562–63 (Wis. 1983).

These cases suggest the land in question must be generally available to the public—akin to a privately owned but public park—in order for the immunity to apply.[7] *See* Copeland at 26 ("Recreational use statutes protect landowners from liability claims only if land in question

---

[7]Several states have expressly adopted this requirement. *See, e.g.*, Conn. Gen. Stat. Ann. § 52–557(g)(a) (2005); Wash. Rev. Code Ann. § 4.24.210(1) (West Supp. 2013).

is made accessible to the public."). Other cases, however, reject this requirement. *See Collins v. Martella,* 17 F.3d 1, 4 (1st Cir. 1994) (interpreting the New Hampshire statute); *Mansion v. United States,* 945 F.2d 1115, 1117–18 (9th Cir. 1991) (interpreting the California statute); *Barrett v. Pa. Gas & Water Co.,* 631 F. Supp. 731, 733–34 (M.D. Pa. 1985); *Johnson v. Stryker Corp.,* 388 N.E.2d 932, 934 (Ill. App. Ct. 1979).

2. *"True outdoors" test.* In a number of cases, state courts have limited the scope of recreational purpose to activities associated with the true outdoors. For example, in *Keelen v. State,* the Louisiana Supreme Court stated that based on the specified activities in the statute the "legislature envisioned immunity for landowners who offer their property for recreation that can be pursued in the 'true outdoors.' " 463 So. 2d 1287, 1290 (La. 1985). Accordingly, even though the case involved swimming in a pool and swimming was an enumerated activity in the statute, the court held the statute only covered "swimming in lakes, rivers, ponds or other similar bodies of water." *Keelen,* 463 So. 2d at 1290–91. Similarly, in *Wymer* the Michigan Supreme Court held that diving into a shallow pond in an urban setting was not among the "outdoor" activities included under the statute. 412 N.W.2d at 219. According to the *Wymer* court, "The commonality among all these enumerated uses is that they generally require large tracts of open, vacant land in a relatively natural state." *Id.* In *Quesenberry v. Milwaukee County,* the Wisconsin Supreme Court refused to grant recreational use immunity to the owner of a golf course, noting that the activities qualifying as recreational purpose were normally done on land in its "natural undeveloped state as contrasted to the more structured, landscaped and improved nature of a golf course." 317 N.W.2d 468, 472 (Wis. 1982). In *Dykes v. Scotts Bluff County Agricultural Society, Inc.,* the

Nebraska Supreme Court held that viewing livestock events at a county fair was not a recreational purpose under Nebraska's recreational use statute because "the activities listed in [the statute] are more physical than not, generally require the outdoors, and are not 'spectator sports.' " 617 N.W.2d 817, 823 (Neb. 2000); *see also Boileau v. De Cecco*, 310 A.2d 497, 499–500 (N.J. Super. Ct. App. Div. 1973), *aff'd*, 323 A.2d 449 (N.J. 1974); *Matthews v. Elk Pioneer Days*, 824 P.2d 541, 542–44 (Wash. Ct. App. 1992).[8]

Collectively, these cases stand for the proposition that recreational use statutes are not sweeping immunity statutes that generally overturn ordinary tort liability for all landowners, including urban residents, but are instead more focused statutes that should be interpreted consistently with the underlying legislative purpose of enhancing outdoor recreational opportunities.[9] Recreational use statutes are designed to cover situations such as when a recreational user trips over a log, twists an ankle in a ground hog burrow, or falls down a ravine hidden by brush while they are on private property to hunt, fish, hike, or the like, not incidents involving a backyard barbecue or a friendly game of hoops in suburbia.

3. *Causal link between injury and recreational use.* As noted by one authority, "courts have routinely ruled that persons entering land to engage in activities outside the scope of the activities outlined in the

---

[8]There is contrary authority. *See Iannotti v. Consol. Rail Corp.*, 542 N.E.2d 621, 623 (N.Y. 1979) (noting the New York recreational use statute "is not limited to claims arising in wilderness, remote or undeveloped areas").

[9]Some state recreational use statutes specifically refer to "outdoor recreational purposes," "outdoor recreational use," or "any other outdoor sport." *See, e.g.*, Mich. Comp. Laws § 324.73301 (West 2009); Miss. Code Ann. § 89–2–3 (West 1999); N.J. Stat. Ann. 2A:42A–2 (2010); Oklahoma, § 10.1 (2012); S.D. Codified Laws sec. 20–9–13 (Supp. 2012).

statute are not classified as recreational users." Carroll, 17 J. Legal Aspects of Sport at 173. For instance, in *Rintelman v. Boys & Girls Clubs of Greater Milwaukee, Inc.*, a chaperone at an educational retreat who slipped and fell on a path was found to be walking on the path in connection with her duties as a chaperone and not for a recreational purpose. 707 N.W.2d 897, 905–06 (Wis. Ct. App. 2005). Similarly, in *Herman v. City of Tuscon*, the court found that an employee of a food vendor who was injured while walking from the parking lot toward a band shell to work as a concessionaire at a music festival was not a recreational user within the meaning of the Arizona recreational use act. 4 P.3d 973, 979 (Ariz. Ct. App. 1999). In *Hontert v. Ohio Department of Natural Resources,* the court held a plaintiff who was injured inside a building, an historic home, located on recreational land was not a recreational user because her activities in the building consisted of taking a tour, viewing a movie about the premises, and shopping in the gift shop. 572 N.E.2d 869, 872 (Ohio Ct. Cl. 1990). In *Harrison v. Middlesex Water Co.*, the Supreme Court of New Jersey held that an individual seeking to rescue two children who had fallen into a frozen pond was not engaged in a recreational use. 403 A.2d 910, 915 (N.J. 1979).

Similarly, in *Crichfield v. Grand Wailea Co.*, a land user who asserted she was on a hotel's property to eat lunch was injured when she left a footpath to admire the hotel's fishpond and statuary. 6 P.3d 349, 351, 353 (Haw. 2000). The Hawai'i Supreme Court held that while there was a genuine issue of material fact as to whether the land user was on the hotel's premises for commercial or recreational purposes, the Hawai'i recreational use statute would not immunize the hotel if she was on the premises for a commercial purpose. *Crichfield,* 6 P.3d at 359–61.

Finally, in *Gerkin v. Santa Clara Valley Water District*, the court determined that where a party was walking her bicycle over a bridge in order to use a telephone at a nearby market and procure a candy bar, there was a material issue of triable fact as to whether she was "hiking" within the scope of the statute. 157 Cal. Rptr. 612, 615–16 (Ct. App. 1979). The court further noted that the "purpose of the journey" should be considered in making this determination. *Gerkin,* 157 Cal. Rptr. at 616.

At the very least, these cases stand for the proposition that, even if the injured individual is on land that might be available for recreational use, that individual may not have been using the land in a recreational fashion and is therefore removed from the purview of the statute. *But see Seminara v. Highland Lake Bible Conference*, 492 N.Y.S.2d 146, 148 (App. Div. 1985) (holding that bicycling across property to retrieve forgotten jacket was recreational). Therefore, while horseback riding may have been within the scope of the statute in this case, frolicking in the hayloft may not be. Further, if a party seeking to preserve the safety of children engaged in outdoor recreation through rescue is not within the scope of a recreational use statute as in *Harrison*, it stands to reason that a chaperone who stands at the ready might not be within the statute either.

Other cases hold that while a trip may have had recreational components, a nonrecreational use of land was not covered by the statute. For example, in *Smith v. Scrap Disposal Corp.*, an individual entered the property to fish, which was an activity clearly covered by the California recreational use statute. 158 Cal. Rptr. 134, 136 (Ct. App. 1979). When leaving, however, the individual was injured when he hopped onto a bulldozer in an attempt to stop his friend from using it.

*Smith,* 158 Cal. Rptr. at 136. The court held that getting onto the bulldozer was not a recreational use within the scope of the statute, even though the injury happened while returning from a covered activity. *Id.* at 137. Similarly, in *James v. Metro North Commuter Railroad,* the court held that a man fishing on a railroad bank was not engaged in recreational use when he crossed the tracks in an effort to rescue his dog. 560 N.Y.S.2d 459, 460–61 (1990).

There are, however, contrary cases. *See, e.g., Thompson v. Kyo–Ya Co.,* 146 P.3d 1049, 1057–58 (Haw. 2006) (holding a scuba diving instructor was on property for recreational purpose when she tripped on a path while leading a group of students from the ocean to the parking lot); *Hafford v. Great N. Nekoosa Corp.,* 687 A.2d 967, 968–69 (Me. 1996) (holding an outfitter supplying canoeing and camping enthusiasts was engaged in activity with a recreational purpose when transporting his staff to pick up his clients' vehicles). Nonetheless, the individuals in these cases were engaged in a business purpose, not a recreational purpose, and thus the immunity should not apply to them. Further, in both cases, the courts seemed preoccupied with the fact that the injured persons were receiving a direct financial benefit from their activities on the land. Such a consideration is not present here.

4. *Invited guest exception.* Some courts have held that the immunity does not apply to invited guests. For instance, a Georgia appellate court held that the immunity statute did not apply where a neighbor invited friends to his backyard pool without charge. *See Herring,* 165 S.E.2d at 199. Further, several statutes expressly contain an invited guest exception. *See, e.g.,* Cal. Civ. Code § 846; Ind. Code Ann. § 14–22–10–2(f)(1)(B); Wis. Stat. Ann. 895.52(6)(d) (West Supp. 2012).

5. *Ancillary structures associated with land.* A number of cases have considered whether injuries occurring in buildings and structures fall within the immunity provisions of the acts. One distinction in these cases turns on the nature of the land upon which the building sits. For example, in *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.,* the Supreme Court of Pennsylvania concluded that the words "buildings, structures and machinery or equipment when attached to the realty" in the Pennsylvania recreational use act was limited "to ancillary structures attached to open space lands made available for recreation and not to an enclosed recreational facilities in urban regions," such as an indoor swimming pool. 507 A.2d 1, 15 (Pa. 1986).

Another distinction turns on the type of activity occurring within the structure. *See Drake ex rel. Drake,* 649 N.E.2d at 1030 (holding a student who decorated an abandoned grain elevator and participated in a haunted house performance was not present for a recreational purpose); *Hontert,* 572 N.E.2d at 872 (holding a tour of an historic home, which included an educational movie and a stop at the gift shop, was not a recreational use, even though the home was located on a farm). *But see Curtiss v. County of Chemung,* 433 N.Y.S.2d 514, 515 (App. Div. 1980) (determining the recreational use statute barred recovery where the plaintiffs' presence in a storage shed was incidental to their entry to and use of the premises for hunting and hiking).

The bottom line is that while under some circumstances activities within a building might give rise to immunity under the statute, there must nonetheless be activity within the structure that amounts to a recreational purpose.

**B. Interpretation of Elastic Recreational Use Provisions.** Even under statutes with catchall provisions expanding the scope of the

definition of "recreational purpose," courts have still required that the land user's activities be outdoor recreational purposes in order to trigger immunity. For example, in *Villanova v. American Federation of Musicians, Local 16*, the court held that the phrase "other outdoor sport, game and recreational activity" did not manifest a legislative intent to bring within the statute's ambit recreational activities that were "forms of play, amusement, diversion or relaxation." 301 A.2d 467, 468 (N.J. Super. Ct. App. Div. 1973); *see also Drake ex rel. Drake*, 649 N.E.2d at 1030 (decorating a grain elevator and participating in a haunted house performance was not "any other purpose"); *Keelen*, 463 So. 2d at 1291 (holding a swimming pool in a state park is not the type of recreation in the true outdoors); *Eschete v. Mecom*, 509 So. 2d 840, 843 (La. Ct. App. 1987) (holding the Louisiana recreational use statute did not bar recovery by a plaintiff who suffered injuries when his boat struck a submerged oil well cribbing in a canal because the injuries were not caused by instrumentalities one would normally encounter in the true outdoors and were instead a man-made trap for the unwary); *Boileau*, 310 A.2d at 499–500 (holding that swimming in a swimming pool was not a "sport or recreational activity" because the New Jersey statute was designed to cover activity conducted in the true outdoors, not in someone's backyard); *Hontert*, 572 N.E.2d at 872 (viewing a movie and shopping in a gift shop not "other recreational pursuits").

A federal district court took a somewhat different approach to an elastic provision in *Fisher v. United States*, 534 F. Supp. 514 (D. Mont. 1982). In this case, a child died while playing on a snowplow during lunchtime on a school field trip. *Fisher*, 534 F. Supp. at 515. The question was whether the Montana statute, which provided that recreational purposes included "picnicking" and "other pleasure

expeditions," barred the suit. *Id.* The court concluded Montana's list of recreational purposes was not exclusive and that the statute should be interpreted to include school field trips within its scope. *Id.* at 515–16. Yet, *Fisher* has not been widely cited, is inconsistent with a California appellate court's decision in *Scrap Disposal,* and was construing a statute containing an expansive catchall provision. The Iowa statute does not contain such language.

**C. Interface Between Tort Law and Recreational Use Statutes.** Courts have also limited application of recreational use statutes to tort claims related to premises liability. The common thread in these cases is that premises liability claims are separate from other negligence claims.

For example, in *Klein v. United States* a cyclist was struck by an automobile driven by the landowner's employee. 235 P.3d 42, 44 (Cal. 2010). The California Supreme Court held that the California recreational use statute related to premises liability, not other tortious conduct, and did not extend to acts of vehicular negligence by a landowner or a landowner's employee. *Klein,* 235 P.3d at 44, 49–50. Similarly, in *Dickinson v. Clark,* a case in which a minor was injured by a wood splitter, the Supreme Judicial Court of Maine held the statute applied only to premises liability claims and not to claims of negligent supervision or instruction. 767 A.2d 303, 305–06 (Me. 2001). Moreover, the Wisconsin Supreme Court considered the interface between traditional tort law and a recreational use statute in *LePoidevin.* There, the plaintiff was injured when she dove from the defendant's pier into shallow water. *LePoidevin,* 330 N.W.2d at 557. The defendant's son and son-in-law were allegedly ridiculing, taunting, and challenging the plaintiff to enter the water and grabbed her towel away from her. *Id.* The

court held the active negligence on the part of the defendants took the plaintiff's claim outside the scope of the statute. *Id.* at 560.

### VI. Iowa Case Law.

In *Peterson*, the plaintiff and his friends were swimming in a lake near a large tree. 460 N.W.2d at 470. Land users frequently attached ropes to the tree in order to swing out over the water. *Id.* at 469. The tree also had pieces of wood nailed to its trunk, which facilitated climbing into the tree. *Id.* at 469–70. The landowner had attempted to discourage swimming on his property by occasionally removing ropes and the pieces of wood from the tree. *Id.* He also posted "private property—no trespassing" signs. *Id.* at 470. The plaintiff, who apparently ignored the posted signs, was paralyzed when he reached for a rope suspended from the tree without the landowner's permission, lost his balance, decided to dive into the water, and hit his head. *Id.* The question was whether the landowner had an obligation to keep the premises safe for trespassers. *Id.* at 471. We held that the recreational statute extended to trespassers and immunized the landowner. *Id.* at 471–72.

In *Scott*, we considered the relationship between immunity in Iowa's recreational use statute and negligence claims. There, a birthday party guest was injured when she fell from a wagon and became trapped beneath it during a hay ride on the defendant's property. *Scott*, 486 N.W.2d at 41. Because the tractor pulling the wagon was driven by the defendants' daughter, the guest sought to recover on a theory of vicarious liability for the driver's negligent operation of the tractor. *Id.* After a verdict for the plaintiff, the defendant appealed, claiming that the recreational use statute prevented recovery. *Id.* at 41–42.

We declined to disturb the jury verdict. We noted that nothing in the legislative history of the recreational use statute "suggests a legislative intent to immunize *all* negligent acts of landowners, their agents, or employees." *Id.* at 42. We emphasized that the statute was enacted to serve " 'a growing need for additional recreation areas for use by our citizenry.' " *Id.* (quoting H.F. 151, 62 G.A., Reg. Sess. explanation (Iowa 1967)). We further stated, "The public's incentive to enter and enjoy private agricultural land would be greatly diminished if users were subject, without recourse, to human error as well as natural hazards." *Id.*

In reaching the conclusion that the statute was so limited, we emphasized that the language of the recreational use statute is "couched in terms of *premises liability*." *Id.* (emphasis added). In short, the inquiry after *Scott* is whether the claim is based upon human error or natural hazards. If the claim is based upon natural hazards, it is barred by the recreational use statute, which extinguishes premises liability claims. If, however, the claim is based upon human error, the immunity provided by the recreational use statute has no application.

**VII. Analysis of Applicability of Recreational Use Statute.**

**A. Framework for Interpretation of Iowa's Recreational Use Statute.** In interpreting a statute, "[w]e consider the objects sought to be accomplished and the evils and mischiefs sought to be remedied." *Klinge v. Bentien,* 725 N.W.2d 13, 18 (Iowa 2006) (citation and internal quotation marks omitted). We seek to advance, rather than defeat, the purposes of the statute. *State v. Tesch*, 704 N.W.2d 440, 451 (Iowa 2005).

When a statute is ambiguous, we look to extrinsic materials to aid in interpretation. *State v. Hearn,* 797 N.W.2d 577, 586 (Iowa 2011). A

statute is ambiguous if reasonable minds could differ as to its meaning. *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995). Ambiguity may arise from the meaning of particular words in the statute or from the general scope and meaning of the statute when considered as a whole. *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996). If a statute is ambiguous, we may consider, among other matters, "[t]he object sought to be obtained," "[t]he circumstances under which the statute was enacted," "[t]he legislative history," "[t]he common law or former statutory provisions," "[t]he consequences of a particular construction," "[t]he administrative construction of the statute," and "[t]he preamble or statement of policy." Iowa Code § 4.6.

Courts and commentators have generally noted that recreational use statutes have many ambiguities. John C. Becker, *Landowner or Occupier Liability for Personal Injuries and Recreational Use Statutes: How Effective is the Protection?*, 24 Ind. L. Rev. 1587, 1613 (1991) (citing a need to clarify ambiguities affecting the coverages and applications of recreational use statutes in specific situations); Ford, 1991 Wis. L. Rev. at 527 (noting that the concept of recreation is amorphous and difficult to define unambiguously); Glen Rothstein, Note & Comment, *Recreational Use Statutes and Private Landowner Liability: A Critical Examination of* Ornelas v. Randolph, 15 Whittier L. Rev. 1123, 1125–26 (suggesting that inadequate and ambiguous definitions of lands, users, and activities covered by recreational use statutes cause disagreements over their application). The lengthy COA and ALR annotations are testament to the many difficulties associated with interpretation of recreational use statutes. *See generally* James Lockhart, Annotation, *Cause of Action for Personal Injury or Death in Which Recreational Use Statute is Raised as a Defense*, 18 C.O.A. 613 (2012); Robin Cheryl Miller, Annotation, *Effect of*

*Statute Limiting Landowner's Liability for Personal Injury to Recreational User*, 47 A.L.R. 4th 262 (1986). At a minimum, as the caselaw demonstrates, reasonable minds can disagree as to whether a recreational use must be a true outdoor activity. Reasonable minds could also disagree as to whether terms like "nature study" or "other summer . . . sports" apply to the facts before us. Plainly, extrinsic aids are appropriate tools for us to use in applying the recreational use statute to the facts of this case.

### B. Applicability of General Limitations to Iowa Statute.

1. *Public at large.* In several places, the Iowa statute, like the 1965 model act, emphasizes that its purpose is to give the public more recreational opportunities. In short, it can be argued that the purpose of the act itself was to establish quasi-parks on private lands where the public would have access in exchange for qualified protection from liability and that the statute should be so interpreted. Such an approach is consistent with the wording of the statute, the purposes of the act, its statutory history, and caselaw in a number of jurisdictions.

Yet, limiting Iowa's recreational use statute to lands generally open to the public is inconsistent with *Peterson*. It could be argued that the result in *Peterson* is inconsistent with the statutory purpose. If the statute applied to posted property not open to the public, as *Peterson* suggests, what incentive does it give to a landowner to open his or her lands to the public? The purpose of the statute was plainly to increase the availability of private lands to public recreation. To extend the statute's protections to property not open to the public not only fails to promote the purposes of the statute, but tends to defeat them. Further, the language in *Peterson* was undercut by subsequent language in *Scott,* where we emphasized that the purpose of the statute was " 'a growing

need for additional recreation areas for use by our citizenry.'" 486 N.W.2d at 42 (quoting H.F. 151, 62d G.A. Reg. Sess. (Iowa 1967)).

Stare decisis, of course, is a relevant consideration here. Because this case can be resolved on other grounds, it is unnecessary to confront the question of whether *Peterson* is good law.

2. *Approach to interpretation of activities covered by Iowa's recreational use statute.* There can be no question that the evil sought to be addressed by recreational use statutes is the inadequacy of resources for outdoor recreation. The history of the development of recreational use statutes, the express language of the ORRRC Report, the 1965 model act, and the 1979 proposed model act all point in that direction. The reasoning in the cases adopting a true outdoors approach to the interpretation of activities covered by recreational use statutes is faithful to the language of the Iowa statute and is focused on the evil sought to be prevented.

Nothing in the Iowa statute suggests a different approach. The list of recreational uses strongly suggests that the statute is designed to protect activities traditionally undertaken outdoors. While the statute recognizes that recreational use immunity may apply to appurtenant structures, such immunity for injuries that occur in structures is only applicable when the structure itself is part of or incidental to the underlying recreational use. Indeed, although there are hundreds of cases involving recreational use immunity, almost none of them occur within structures. For those that do, the user was actually engaged in the recreational purpose while inside the structure.

Further, the fact that the legislature has not adopted expansive language in its recreational purpose section provides us with a strong reason for caution. The legislature clearly has not empowered this court

to expand or update the list of recreational purposes. The legislature has declined to follow the "includes, but is not limited to" language of the 1965 model act and the even more expansive language of the 1979 proposed model act. While such an action might be supported by policy reasons, any such action must be taken by the legislature, not by us.

As a result, we conclude that the best interpretation of Iowa's recreational use statute is that the closed universe of activities specifically listed in section 461C.2(5) must be interpreted in a fashion consistent with promoting true outdoor activity. With this concept in mind, we now turn to the specific language of the Iowa statute to determine whether the activity in this case falls within the scope of its immunity provision.

**C. Determination of Whether Sallee's Activities Constitute a Recreational Use.** As noted above, the legislature has given us a closed definition of "recreational purpose." We thus do not add, or subtract, from the legislative definition. *See Gough v. County of Duchess*, 638 N.Y.S.2d 290, 291–92 (Sup. Ct. 1996) (refusing to interpret "hiking" in the New York recreational use statute to include an infant's 500 to 600-foot walk through a field); *see also Brooks v. Northwood Little League, Inc.*, 489 S.E.2d 647, 651 (S.C. Ct. App. 1997) (noting that South Carolina's statute, by its express terms, "invites judicial expansion where the plain meaning of the statute would not be distorted"). We do not engage in innovations or improvements of the statute. Rather, we interpret it as we find it. *See State v. Spencer*, 737 N.W.2d 124, 129–30 (Iowa 2007). The district court determined Sallee's claims were barred by the recreational use statute because she chaperoned children who engaged in horseback riding and nature study. We disagree.

1. *Horseback riding.* Like many recreational use statutes, Iowa's definition of "recreational purpose" includes "horseback riding." Iowa Code § 461C.2(5). However, the mere fact that some of the field trip's activities might qualify as recreational uses does not mean that summary judgment was properly granted to the defendant in this case. The issue is not whether horseback riding may qualify as a recreational use. The issue is more nuanced. Here, Sallee's injury did not occur while she was riding a horse. To be sure, while there was some deposition testimony that Sallee "helped with the horse," there is nothing in the record clarifying what that help entailed or indicating that Sallee rode a horse. Even assuming Sallee did ride a horse, however, her injury occurred in a barn that had no obvious relationship to the horseback riding. There was no claim, for instance, that Sallee's presence in the barn was somehow incident to horseback riding. We agree with the courts that have concluded the relevant inquiry is what the plaintiff was doing at the time the plaintiff was injured. *See, e.g.*, *City of Bellmead v. Torres*, 89 S.W.3d 611, 614 (Tex. 2002); *see also Smith v. Ariz. Bd. of Regents*, 986 P.2d 247, 252 (Ariz. Ct. App. 1999) (noting the inquiry is whether the plaintiff was engaged in the type of activity contemplated by the statute at the time of the injury). At a minimum, there is an issue of material fact as to whether the presence of the plaintiff in the barn's hayloft where she was injured was not a necessary incident of horseback riding. In any event, the district court erred to the extent it granted summary judgment on the basis that Sallee was engaged in horseback riding.

2. *Nature study.* Like horseback riding, nature study is also included in the laundry list of recreational purposes under the recreational use statute. Iowa Code § 461C.2(5). The Nebraska Supreme Court held that looking at livestock at a county fair did not amount to

nature study under Nebraska's recreational use statute. *Dykes*, 617 N.W.2d at 823. The court observed that "nature" is defined as " '[a] wild condition, untouched by civilization' " or " '[t]he elements of the universe, such as mountains, plants, planets, and stars.' " *Id.* at 823 (quoting *Black's Law Dictionary* 1050 (7th ed. 1999)). Consistent with the history of recreational use statutes outlined above, the term "nature study" may well include outdoor activities such as bird watching, butterfly observation, and the study of pond flora and fauna, but it is difficult to characterize frolicking in a hayloft as part of a guided tour of an improved barn on a dairy farm as nature study within the meaning of the statute. Accordingly, the district court erred to the extent it held that Sallee was engaged in nature study at the time of her injury.

3. *Other summer sports.* A number of recreational use statutes identify "sports," "summer sports," or "other summer sports" as defining terms of "recreational purpose." Indeed, the 1965 model act included "winter sports" as one such defining term. Though the Stewarts did not so argue on appeal, there have been suggestions that "other summer . . . sports," as used in section 461C.2(5) includes frolicking in a hayloft. In any event, there are compelling reasons as to why frolicking in a hayloft is not within the ambit of other summer sports.

Though commonly a defining term of "recreational purpose," many states do not provide an independent definition of what constitutes these sports. Alaska, however, is one state that does. Alaska's recreational use statute includes the phrase "sports or recreational activity" in defining its scope. Alaska Stat. 09.65.202(f)(5) (2012). The statute defines "sports or recreational activity" as:

> a commonly understood sporting activity, whether undertaken with or without permission, including baseball, softball, football, soccer, basketball, hockey, bungee

43

> jumping, parasailing, bicycling, hiking, swimming, skateboarding, horseback riding and other equine activity, dude ranching, mountain climbing, river floating, whitewater rafting, canoeing, kayaking, hunting, fishing, backcountry trips, mushing, backcountry or helicopter-assisted skiing, alpine skiing, Nordic skiing, snowboarding, telemarking, snow sliding, snowmobiling, off-road and all-terrain vehicle use.

*Id.* § 09.65.290(e)(3)(A).

The Supreme Court of Montana was called upon to determine whether a football-type game called "500" was considered to be a recreational purpose under the Montana use statute. *See Kapphan v. Vincent*, No. DA 09–0182, 2009 WL 3764109, at *2 (Mont. Nov. 10, 2009). Because the Montana statute contains a nonexhaustive list of activities defining "recreational purpose" and because one of those defining terms is "winter sports," the court concluded the game was a recreational purpose. *Id.* In addition to noting that outdoor hockey played on a frozen pond was a winter sport within the ambit of the statute, the court noted that " 'recreational purpose,' as commonly understood and used in common parlance, would clearly include games such as soccer, Frisbee, basketball, football, '500,' or a variety of other pursuits." *Id.* Similarly, a South Carolina court determined T-ball was a "summer sport" within the meaning of the South Carolina statute. *See Brooks*, 489 S.E.2d at 651.

A Wisconsin appellate court concluded that playing catch with a football in a city park was "an outdoor sport or game" under its recreational use statute. *See Taylor v. City of Appleton*, 433 N.W.2d 293, 294 (Wis. Ct. App. 1988). That court specifically noted that the Wisconsin legislature "directed a liberal interpretation of the statute," which states that "recreational activity" means "any outdoor activity undertaken for the purpose of exercise, relaxation or pleasure." *Id.*

(citation and internal quotation marks omitted). The Wisconsin statute then lists a number of activities, but includes in that list "any other *outdoor* sport, game, or educational activity." *Id.* (emphasis added) (citation and internal quotation marks omitted). Thus, in addition to interpreting the legislative history to require a liberal construction of the statute, the statute itself also included catchall language.

In a related situation, the Supreme Court of Georgia found that persons enjoying the Atlanta Olympic Park at the 1996 Summer Olympics were engaged in a recreational purpose because the park was "created to celebrate the spirit of an historic athletic and cultural event and to provide a gathering place for visitors to relax and enjoy themselves." *Anderson*, 537 S.E.2d at 348. However, the Georgia statute broadly defines "recreational purposes" using the "includes, but is not limited to" language of the 1965 model act. *Id.* at 347; *see also* Ga. Code Ann. § 51–3–21(4). Thus, the court was able to broadly define "recreational activity" as "any amusement, play or other form of relaxation which refreshes the mind or body." *Anderson*, 537 S.E.2d at 348. Further, the court seemed focused only on whether the property was recreational in nature and not whether the user was engaged in a recreational purpose while on the property. *See id.*

The common thread in these cases and definitions is that "sport," as it is contemplated by recreational use statutes, is narrower than a definition meaning merely "a source of diversion" or "physical activity engaged in for pleasure." *See Merriam-Webster's Collegiate Dictionary* 1134 (10th ed. 2002). Even so, there are further reasons why it is not possible to give the definition of "other summer sports" an expansive reading outside the context of the other activities mentioned in the statute.

First, when a phrase like "other summer sports" is added to a laundry list of terms all of which relate to outdoor activity, we interpret "other summer sports" to be similar in character to the other activities, all of which relate to outdoor recreation. *See Drake ex rel. Drake*, 649 N.E.2d at 1030 (decorating an abandoned grain elevator and participating in a haunted house performance was not within statute because those activities are inconsistent with general class of behavior typified by hunting, fishing, swimming, trapping, camping, hiking, and sightseeing). The fancy term for this is *ejusdem generis*.

Second, if the term "other summer sports" simply meant pleasurable activity or a source of diversion, then the *existing* laundry list of activities in the statute would become meaningless. They would be swallowed up by the new expansive phrase. Further, the amendments *subsequent* to the 1971 addition of the phrase "other summer sports" would be entirely superfluous. *See Quesenberry*, 317 N.W.2d at 472 (noting that the addition of "snowmobiling, wood cutting and observation tower climbing" to the Wisconsin statute would have been superfluous if these activities would have otherwise already been covered under a broad interpretation of "recreational uses or purposes" (internal quotation marks omitted)). We cannot convert the phrase "other summer sports" into a statutory PAC-MAN that goes backward to gobble up preexisting statutory limitations and then goes forward to consume subsequent legislative language.

Third, an expansive reading of the term is inconsistent with the statutory history. As noted above, the Iowa legislature, unlike the majority of states, has refused to insert potentially expansive language in the definition of "recreational purpose." The legislature altered the language of the 1965 model act and did not adopt the proposals in the

1979 proposed model act. Accordingly, Sallee did not engage in other summer sports as contemplated by the statute.

4. *Summary.* As a result of the above analysis, the activities which occurred in the hayloft do not constitute recreational uses under the Iowa statute. Further, Sallee's injuries cannot be characterized as resulting from horseback riding, nature study, other summer sports, or any other specifically enumerated recreational purpose. As a result, the district court erred in granting summary judgment for the defendants based on the limited immunity provided in Iowa's recreational use statute.

**VIII. Willful or Malicious Conduct.**

Section 461C.6(1) provides that any immunity under the recreational use statute does not extend to "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." Iowa Code § 461C.6(1). Sallee claims the record in this case raises a genuine issue of material fact as to whether this exception applies. Because Sallee does not claim the Stewarts acted maliciously, the only question is whether there is a triable issue on whether the Stewarts acted willfully.

We considered the question of what amounted to willful failure to guard against a dangerous condition under the recreational use statute in a per curiam decision in *Bird v. Economy Brick Homes, Inc.,* 498 N.W.2d 408 (Iowa 1993). In that case, the defendant erected a steel cable across an access road to prevent vehicles from entering the property. *Bird*, 498 N.W.2d at 408. While we recognized a split in authority on the issue, we held that the placement of the steel cable, *without more*, did not amount to a willful failure to guard against a dangerous condition. *Id.* at 410. Because it was a per curiam decision,

we did not engage in extensive analysis of the meaning of "willful" and we did not adopt a specific standard for determining precisely what kind of conduct amounted to willful under the recreational use statute.

In any event, *Bird* is a dangerous condition case. There is no suggestion in *Bird* that the defendant was present when the plaintiff drove his motorcycle down the access road and failed to warn of the cable across the road. The case might well have had a different outcome if the defendant had an opportunity to warn Bird of the dangers posed by a cable across the road, but failed to do so.

We now turn to other authorities. One leading authority states that willful conduct may be found under a recreational use statute only where "a known or obvious risk so great as to make it highly probable that harm will result." 3 Louis A. Lehr, Jr., *Premises Liability 3d*, § 54.41 (2012). In *Mandel v. United States*, the Eighth Circuit indicated that willfulness requires knowledge or an appreciation that "danger is likely to result." 719 F.2d 963, 967–68 (8th Cir. 1983). In construing the related phrase "willful and wanton," we have stated that the actor must show " 'disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow.' " *Brokaw v. Winfield–Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 396 (Iowa 2010) (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000)).

We conclude that the plaintiff has not presented sufficient evidence to allow a reasonable fact finder to find that defendants acted willfully. The defendants knew that Sallee was a very large woman. There is insufficient evidence in the record, however, to support a finding that Sallee would likely sit or stand on the hay bales covering the hole in the loft or that it was highly probable that the hay bales would almost assuredly collapse as a consequence, thereby causing serious injury.

**IX. Conclusion.**

We hold the limited immunity provided by the recreational use statute does not apply in this case. We further conclude, however, that the plaintiff has not raised a triable issue of willful or malicious conduct. As a result, the decision of the district court is reversed and the case is remanded for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED, AND CASE REMANDED.**

All justices concur except Wiggins, J., who concurs specially and Waterman and Mansfield, JJ., who dissent.

**WIGGINS, Justice (concurring specially).**

I concur with the majority opinion. I write separately, however, because, under the facts of this case, I would find the plaintiffs were entitled to a trial in the event the immunity provided by the recreational use statute applied to the activity of children playing in a barn's hayloft. For the reasons expressed below, I believe the Sallees' claim of negligent supervision is outside the scope of the statute's immunity and thus, is an independent basis for seeking recovery from the Stewarts.

**I. Relationship Between Negligent Supervision and Premises Liability Claims.**

We have one case that considers the relationship between negligence claims and the immunity accorded in Iowa's recreational use statute. In *Scott v. Wright,* the plaintiff was injured when she fell off and then was pinned under a hay wagon during a hayride on the defendants' property. 486 N.W.2d 40, 41 (Iowa 1992). The plaintiff sought to recover on a theory of vicarious liability for the driver's negligent operation of the tractor. *Scott,* 486 N.W.2d at 42. After a verdict for the plaintiff, the defendants appealed, claiming the recreational use statute immunized the defendants from suit and accordingly, barred the plaintiff's recovery. *Id.* at 41–42.

There, we declined to disturb the jury verdict. *Id.* at 42. A review of the statute's legislative history revealed that nothing in the language of the recreational use statute "suggests a legislative intent to immunize *all* negligent acts of landowners, their agents, or employees." *Id.* We emphasized the statute was enacted to serve " 'a growing need for additional recreation areas for use by our citizenry.' " *Id.* (quoting H.F. 151 62d G.A., Reg. Sess., explanation (Iowa 1967)). Accordingly, our

holding was also based upon the following practicality: "The public's incentive to enter and enjoy private agricultural land would be greatly diminished if users were subject, without recourse, to human error as well as natural hazards." *Id.*

In focusing the scope of the statute so narrowly, we emphasized that the language of the recreational use statute "is couched in terms of *premises liability.*" *Id.* (emphasis added). In short, the test announced in *Scott* is whether the claim is based upon "human error" or "natural hazards." *Id.* If the claim involves natural hazards, the immunity in the recreational use statute applies and bars the plaintiff's claim, which subsequently extinguishes any premises liability claims. However, if the claim arises from human error, the recreational use statute provides no immunity.

In addition to *Scott,* we have had at least one other occasion to consider the interplay between claims involving negligent supervision and claims for premises liability. In *Sweeney v. City of Bettendorf*, we considered whether the City was liable for negligently supervising a child who was injured by a flying bat at a city-sponsored trip to a baseball game. 762 N.W.2d 873, 875–76 (Iowa 2009). We recognized that under the applicable precedent, the plaintiffs had no premises liability claim against the baseball stadium's owner or operator. *Sweeney*, 762 N.W.2d at 882–83. However, the plaintiffs still had a negligence claim against the City. *Id.* at 883. To reach this conclusion, we stated that "a negligent supervision case is fundamentally different than a case involving premises liability." *Id.* at 882. We emphasized the claim against the City "does not relate to the instrumentality of the injury, but instead focuses on the proper care and supervision of children in an admittedly risky environment." *Id.*

In *Sweeney,* we approvingly cited the case, *Cook v. Smith,* 33 S.W.3d 548 (Mo. Ct. App. 2000). *See Sweeney,* 762 N.W.2d at 883. In *Cook,* the plaintiff was invited to the defendants' farm for a party. 33 S.W.3d at 551. While there, the plaintiff rode an ATV and was subsequently injured. *Id.* The plaintiff brought a two-count action against the defendant landowners, alleging premises liability and negligent supervision. *Id.* The court dismissed the premises liability claim, but allowed the negligence claim to go forward, thereby demonstrating the different theoretical bases for premises liability and negligence. *Id.* at 552–55.

## II. Viability of Plaintiffs' Negligence Claim.

The question then is whether the defendants were entitled, as a matter of law, to summary judgment on the plaintiffs' negligence claim under the facts presented in this case.

In order to support a claim of negligence, there must be some kind of duty owed to the plaintiff. *See, e.g., Doe v. Cent. Iowa Health Sys.,* 766 N.W.2d 787, 792 (Iowa 2009) (recognizing a duty may arise pursuant to a statutory enactment). The court of appeals found the Stewarts owed a duty to Sallee, based upon the Stewarts' affirmative action of providing a guided barn tour.

The analytical approach used by the court of appeals in reaching this conclusion is sound because the Stewarts wear two hats in this case. One hat is that of landowners. The other hat is that of tour guides. Although the Stewarts have immunity as landowners under the recreational use statute if the activity resulting in Sallee's injury had a recreational purpose, the statute has no impact whatsoever on the distinctly different question of whether the Stewarts owed a duty of care when they guided the barn tour.

This is true because the immunity provided by Iowa Code section 461C.3 is limited to premises liability claims. The immunity provision specifies that "an owner of land" has no duty "to keep the premises safe" or warn of dangerous conditions, uses, structures, or activities "on such premises." Iowa Code § 461C.3 (2009). Surely we all recognize this as classic premises liability language.

Here, however, the Sallees have a negligence claim that is independent of premises liability. The Sallees have stated a cause of action based upon the acts or omissions of the Stewarts as supervisors of the barn tour. This claim differs from premises liability, which is passive because a landowner who does nothing can be liable based on a failure to act. Here, the Stewarts covered the hay drop and directed Sallee to the hayloft.

The Sallees' negligence claim is supported by the Restatement (Second) of Torts section 324A (1965), which provides that one may be liable for harm to another if he or she gratuitously undertakes "to render services to another which he [or she] should recognize as necessary for the protection of a third person . . . if his [or her] failure to exercise reasonable care increases the risk of such harm." To give the claim a shorthand name, it is a negligent supervision claim. We have imposed liability for such claims under the rule contained in section 324A. *See, e.g.*, *Craven v. Oggero*, 213 N.W.2d 678, 682 (Iowa 1973) (holding a supervisor who assumes the obligation to provide a safe place for an employee can be held liable under section 324A); *Fabricius v. Montgomery Elevator Co.*, 254 Iowa 1319, 1325–28, 121 N.W.2d 361, 364–66 (1963) (imposing liability for negligent inspection gratuitously undertaken by an insurance company).

The distinction I draw between premises liability and negligent supervision claims is generally recognized in the case law. *See Raburn v. Wal-Mart Stores, Inc.*, 776 So. 2d 137, 139–41 (Ala. Civ. App. 1999) (noting that while an owner may not have an initial duty to prevent injuries to business invitees as a result of criminal acts, liability may result from negligent performance of a voluntary undertaking to apprehend criminals); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985) (recognizing a duty to keep a premises safe can subject a general contractor to liability for negligence in cases "arising from a premises defect" or "those arising from an activity or instrumentality"); *see also Sidwell v. Griggsville Cmty. Unit Sch. Dist. No. 4*, 588 N.E.2d 1185, 1188–89 (Ill. 1992) (deciding a case mirroring the facts here, where the court found a limited immunity statute barred claims of negligent supervision against teachers, but did not bar premises liability claims against the school district).

Perhaps more importantly, the distinction between negligent supervision and premises liability is widely recognized across the jurisprudential landscape of recreational use statutes. For instance, in *LePoidevin v. Wilson*, the Wisconsin Supreme Court distinguished a premises liability claim, which was subject to an immunity defense under Wisconsin's recreational use statute, from a negligence claim arising from the landowner's son taunting the plaintiff into diving headfirst into a three-foot-deep pond. 330 N.W.2d 555, 559–62 (Wis. 1983). Similarly, in *Klein v. United States*, the California Supreme Court found that a recreational use statute did not extinguish claims arising from the negligent acts of owners on the premises. 235 P.3d 44, 47–53 (Cal. 2010). In *Dickinson v. Clark*, the court noted that a recreational use statute did not apply to a claim related to the landowner's negligent

supervision of a minor operating a log splitter. 767 A.2d 303, 305–06 (Me. 2001). Finally, in *Sena v. Town of Greenfield*, the court found that a city could be held liable for sledding injuries, where the city actually supervised the activity, notwithstanding potential coverage by a recreational use statute. 696 N.E.2d 996, 999–1000 (N.Y. 1998). Thus, even though a recreational use statute may bar a plaintiff's claim based upon premises liability, the plaintiff may still have a viable claim against the defendant under the theory of negligent supervision.

To determine whether a plaintiff has a viable claim of negligent supervision, the court must look to the level of control the defendant exercised over the plaintiff's activity. In *Cohen v. Heritage Motor Tours, Inc.*, the court found a tour guide assumed a duty by instructing participants to cross a stream in a particular manner. 618 N.Y.S.2d 387, 389 (App. Div. 1994). This voluntarily assumed duty, of course, was not related to any potential premises liability claim that the plaintiff might have asserted against the landowner. Similarly, in *Gordon v. Muchnick*, the court found a jury question was raised as to whether the defendant assumed an undertaking sufficient to give rise to a duty of care, where the defendant guided the plaintiff across a street. 579 N.Y.S.2d 745, 745 (App. Div. 1992).

In short, the court of appeals got it right on this issue. The Sallees have stated a claim based upon negligent supervision that is independent of their cause of action for premises liability. As a result, even if the immunity in the recreational use statute covered the activity of playing in a hayloft and precluded recovery, the Stewarts' affirmative conduct raises another claim outside the scope of the statute and presents a triable issue not subject to summary judgment.

**MANSFIELD, Justice (dissenting)**.

Sometimes two acts of generosity collide and lead to an unfortunate result. That is what happened in this case. Matthew and Diana Stewart invited a kindergarten class to visit their dairy farm on a field trip. Kimberly Sallee volunteered her time to serve as a chaperone for the visit. While Sallee was accompanying the children during their playtime in a hayloft, she fell through a chute that was covered by hay bales and broke her wrist and ankle. Sallee sued the Stewarts for her injuries. The Stewarts answered and asserted Iowa's recreational use immunity, Iowa Code §§ 461C.1–.8 (2009), which limits the liability of landowners who allow others to use their premises without charge for recreational purposes.

Sallee argued for several reasons that the immunity did not apply. The district court disagreed and granted summary judgment to the Stewarts. I would affirm the district court for the reasons set forth herein.

While I believe the majority opinion displays the usual scholarship characteristic of its author, it suffers from conceptual flaws. In particular, it overemphasizes what other states have done and underemphasizes what Iowa has done. As my colleagues acknowledge, when we get to the critical provisions involved in this case, Iowa's recreational use law is largely sui generis. Therefore, I believe it is important to focus on the evolution of *our* law. Iowa's recreational use statute, from the very outset, was designed to encourage farmers to offer free recreational use of their lands and appurtenant buildings. It turns this law upside down to hold that jumping in a hayloft during a gratuitous field trip was not such a use.

### I. Iowa's Recreational Use Law.

As first enacted in 1967, Iowa's statute was limited to private agricultural lands and "buildings, structures and machinery or equipment appurtenant thereto." 1967 Iowa Acts ch. 149, § 2. Thus, the original definition of "land" covered by the act read as follows:

> "Land" means land used for agricultural purposes, including marshlands, timber, grasslands and the privately owned roads, water, water courses, private ways and buildings, structures and machinery or equipment appurtenant thereto.

*Id.* Accordingly, from the very beginning, our general assembly sought to protect agricultural lands as well as "buildings, structures and machinery or equipment" that were "appurtenant thereto," such as a barn. *Id.*

Meanwhile, the legislature's original, unique-to-Iowa definition of "recreational purpose" read as follows:

> "Recreational purpose" means the following or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites while going to and from or actually engaged therein.

*Id.*

In 1971, the legislature added "horseback riding" to the list of approved recreational purposes. 1971 Iowa Acts ch. 129, § 1. Later in the same session, the legislature expanded the definition of "recreational purpose" to include "motorcycling" and "snowmobiling," while it substituted the phrase "other summer and winter sports" for "winter sports." *Id.* ch. 130, § 1. Although we do not have helpful legislative history for the second 1971 amendment, it seems logical to conclude that the legislature wanted to obviate the need for future piecemeal

amendments by including some kind of a catchall—other summer and winter sports.

In 1978, the legislature expanded the definition of "land" to include "abandoned or inactive surface mines" and "caves," in addition to "land used for agricultural purposes." 1978 Iowa Acts ch. 1066, § 1. In 1988, the legislature added "trapping" to the list of covered "recreational purposes." 1988 Iowa Acts ch. 1216, § 46.

In 2006, the general assembly inserted the phrase "or urban deer control" where it appears in the current version of the statute. *See* 2006 Iowa Acts ch. 1121, §§ 1, 4, 5. Simultaneously, the legislature greatly expanded the previous definition of "land." *Id.* § 2. Until then, as noted, only certain categories of land had been covered, one of those categories being agricultural land. The 2006 legislation inserted the phrase "private land located in a municipality including," essentially bringing all private land within the scope of the statute. *Id.*[10] A final amendment, in 2012, added "all-terrain vehicle riding" within the definition of "recreational purpose." *See* 2012 Iowa Acts ch. 1100, § 58.

We have previously referred to chapter 461C as "a blanket abrogation of duty to all recreational users (except as provided in section [461C.6])." *Peterson v. Schwertley*, 460 N.W.2d 469, 471 (Iowa 1990) (finding that the statute barred a claim brought by a young man who had trespassed on the defendant's property to go swimming and was paralyzed by a fall).

---

[10]Presumably, the legislature decided to broaden the definition of "land" in 2006 when it added "urban deer control" to the protected purposes because controlling the urban deer population would require entry onto properties that did not fit the earlier, narrower definition of "land." The enrolled bill was entitled, "An act allowing private landowners limited immunity from premises liability during urban deer control hunts." 2006 Iowa Acts ch. 1121.

## II. Does the Immunity Apply to the Stewarts' Barn?

The first question to be answered is whether the Stewarts' dairy barn is the *kind* of property to which the recreational use immunity can apply. I think the answer is clear from the statute. The statutory immunity extends to "buildings" and "structures," *see* Iowa Code § 461C.2(3), so long as they are "appurtenant" to a category of "land" that is covered by the statute, *see id.* The statute nowhere requires an outdoor use, and indeed the reference to buildings is inconsistent with such a restriction.

It is true that courts in other jurisdictions have reached differing conclusions as to the kinds of properties that are covered by their respective recreational use laws. As one court has said, "[W]e observe a widespread conflict among the jurisdictions as to exactly what type of land is intended to be covered by the liability limitation." *Redinger v. Clapper's Tree Serv. Inc.*, 615 A.2d 743, 745 (Pa. Super. Ct. 1992). Thus, the Pennsylvania Supreme Court has held that an indoor swimming pool is not covered. *Rivera v. Phila. Theological Seminary*, 507 A.2d 1, 8 (Pa. 1986) (stating that the legislature intended to limit buildings, structures, machinery, or equipment to "ancillary structures attached to open space lands made available for recreation"). The Louisiana Supreme Court concluded that an outdoor swimming pool was not covered. *Keelen v. State*, 463 So. 2d 1287, 1290 (La. 1985) (stating that "when the instrumentality . . . is of the type usually found in someone's backyard, then the statutes afford no protection"). On the other hand, the Massachusetts Supreme Judicial Court has found that the immunity applies to an indoor gymnasium. *Seich v. Town of Canton*, 686 N.E.2d 981, 983 n.5 (Mass. 1997). And the Ninth Circuit has held that Hawaii's act covers urban swimming pools. *See Palmer v. United States*, 945 F.2d

1134, 1135–36 (9th Cir. 1991). *But see Cassio v. Creighton Univ.*, 446 N.W.2d 704, 711 (Neb. 1989) (holding that Nebraska's act does not apply to independent indoor recreational facilities, including swimming pools). Given this divergence of views, I think it is most helpful to look at what we did here in Iowa.

When our general assembly enacted Iowa's recreational use immunity law in 1967, it modified the proposed model act's definition of "land." The model act stated:

> "Land" means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty.

Council of State Governments, *Public Recreation on Private Lands: Limitations on Liability*, 24 Suggested State Legislation 150, 151 (1965) [hereinafter Council of State Governments]. However, our legislature chose the following language:

> "Land" means land used for agricultural purposes, including marshlands, timber, grasslands and the privately owned roads, water, water courses, private ways and buildings, structures and machinery or equipment appurtenant thereto.

1967 Iowa Acts ch. 149, § 2.

Thus, from the outset, our legislature made a decision that Iowa would go its own way and have an immunity directed to agricultural properties. The general assembly stated that the immunity would cover agricultural land "and buildings, structures and machinery or equipment appurtenant thereto." *Id.* Hence, the legislature expressly included buildings, so long as they were appurtenant. Black's Law Dictionary defines "appurtenant" to mean "[a]nnexed to a more important thing." *Black's Law Dictionary* 118 (9th ed. 2009). Therefore, a barn that is part

of a substantial farm operation like the Stewarts' qualifies as an appurtenant building.

My colleagues raise the concern that Iowa's recreational use immunity could possibly lead to strange results, such as coverage for a backyard barbecue. But this concern, to the extent it exists, follows largely from the legislature's 2006 expansion of the definition of "land" as part of its urban deer control amendment. This is not a reason to deny the Stewarts' immunity for activities in an agricultural building that always has been covered by the statute.[11]

Alternatively, my colleagues suggest that because the Stewarts only allowed a few, specified groups on their farm, it was not open to the public and the recreational use immunity does not apply. This too is a misreading of the statute, which contains no such qualification. Section 461C.3 provides there is no duty owed to "others" who enter or use the property for recreational purposes. Section 461C.4 covers "any person" who is invited or allowed to use the property for recreational purposes. Significantly, we found that Iowa's recreational use immunity applied in *Peterson* even though the landowner had posted no trespassing signs and thus the property was not open to the general public. 460 N.W.2d at 470–71. As we explained:

> That statute [what is now section 461C.3] simply refers to recreational use by "others." We believe the word "others" embraces all persons other than the landowner who makes such use of the property.

---

[11]My colleagues assert that a building, to be covered, must be appurtenant to a recreational use in the "true outdoors." This is the majority's gloss on the statute. It is not what the legislature enacted. The legislature required that the building be appurtenant to the *land*, not to the recreational use, let alone to an outdoor recreational use. *See* Iowa Code § 461C.2(3). As noted by the court of appeals, "The Stewarts' dairy farm and appurtenant buildings qualify for limited liability by this definition."

*Id.* at 471. Although my colleagues call into question the continued vitality of *Peterson*, there is no justification for doing so. This precedent is twenty-two years old, and the legislature in 2006 made a substantial modification of the statute without disturbing it. In any event, the case was correctly decided.

As the Missouri Supreme Court has said, in a case holding that a farmer who allowed two turkey hunters onto his property free of charge could assert the same immunity:

> The use of the term "public" merely reflects the fact that the statute is designed to encourage landowners with property suitable for certain recreational activities to allow members of the public to participate in those activities. Nowhere does the [Missouri statutory recreational use immunity] require that land be opened to the entire general public, and this Court will not add language to a statute that is clear and unambiguous.

*State ex rel. Young v. Wood*, 254 S.W.3d 871, 873 (Mo. 2008); *see also Howard v. United States*, 181 F.3d 1064, 1071 (9th Cir. 1999) ("The [Hawaii recreational use immunity statute] does not contain a requirement that a landowner allow each and every individual of the general public access and use of the land . . ."); *Holden v. Schwer*, 495 N.W.2d 269, 274 (Neb. 1993) ("[I]n order to facilitate the purpose of [the Nebraska recreational use immunity statute] a landowner need allow only some members of the public, on a casual basis, to enter and use his land for recreational purposes to enjoy the protection of the act.").[12]

I recognize that some other jurisdictions have ruled otherwise. *See Hall v. Henn*, 802 N.E.2d 797, 799–800 (Ill. 2003) (holding that Illinois's

---

[12]Because sections 461C.3 and 461C.4 of Iowa's act are identical to the model act—save for Iowa's addition of "urban deer control" and substitution of "holder of land" for "owner of land"—I believe that out-of-state cases are more relevant here. *Compare* Iowa Code §§ 461C.3, .4, *with* Council of State Governments, 24 Suggested State Legislation at 151.

recreational use immunity statute does not apply to "landowners who restrict the use of their property to invited guests only"); *Loyer v. Buchholz*, 526 N.E.2d 300, 302 (Ohio 1988) (holding that Ohio's statute "does not extend to private owners of residential swimming pools whose social guest is injured while swimming, where the premises in question are not held open for gratuitous recreational use by the general public"); *Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1293 (Utah 1996) (holding that "to qualify for immunity under [Utah's statute], landowners must make their land available to all members of the general public"). But these courts have done so on the basis that this limitation is necessary because those state statutes would otherwise provide immunity for homeowners from negligence claims brought by social guests who enter for recreational purposes. *See Hall*, 802 N.E.2d at 800 (stating that "defendant's reading of the Act, while textually plausible, renders an absurd and unjust result"); *Loyer*, 526 N.E.2d at 302; *Perrine*, 911 P.2d at 1293. I do not believe we are at liberty to rewrite the statute, at least where the result in this case is not absurd or unjust. Farmers who allow school groups, but not every member of the general public, to enjoy their property for recreational purposes, are still entitled to the benefit of the statute if the other requirements of the immunity have been met.

### III. Was Sallee Engaged in a Recreational Purpose?

My colleagues conclude that the immunity should not apply because the excursion to the hayloft was not a recreational purpose. I disagree.

The Stewarts contended that the Sacred Heart kindergarten field trip potentially involved three activities specifically identified in Iowa's statute: "horseback riding, . . . nature study, . . . other summer and

winter sports." Iowa Code § 461C.2(5). I believe the third category is dispositive of this case. As noted, this part of Iowa's statute is distinctive. To my knowledge, no other state's definition of "recreational purpose" uses the same "other summer and winter sports" terminology. Therefore, out-of-state cases are of limited value.

The term "sport" has a number of definitions. For example, Merriam-Webster's Collegiate Dictionary defines sport as "a source of diversion: RECREATION," and "physical activity engaged in for pleasure," among other things. *See Merriam-Webster's Collegiate Dictionary* 1134 (10th ed. 2002).

In *City of Marion v. Iowa Department of Revenue & Finance*, we held that the department could tax municipal swimming pool admission fees on the theory that these were "fees paid to cities and counties for the privilege of participating in any athletic sports." 643 N.W.2d 205, 206–08 (Iowa 2002). There, we upheld the department's interpretation of "athletic sports" as including recreational swimming. *City of Marion*, 643 N.W.2d at 207. The agency had specifically defined a "sport" as "any activity or experience which involves some movement of the human body and gives enjoyment or recreation." *Id.*

On the other hand, a federal district court recently observed that "it is not clear that snorkeling falls within the plain meaning of 'sports,' " relying on other dictionary definitions that require a "sport" to be governed by "form," "rules," or "customs." *Hawaiian Isle Adventures, Inc. v. N. Am. Capacity Ins. Co.*, 623 F. Supp. 2d 1189, 1197–98 (D. Haw. 2009).

As I have noted, the "other summer and winter sports" language was part of a 1971 amendment where the legislature also added "motorcycling" and "snowmobiling" to the list of covered activities. 1971

Iowa Acts ch. 130, § 1. I think that by doing so, the legislature opted for a broader definition of "sports"—similar to the one we upheld in *City of Marion*—rather than a definition limited to contests governed by forms, rules, or customs. By using the word "other," the legislature implied that items previously listed in the definition, and particularly motorcycling and snowmobiling which were being added, were also sports. *See, e.g., State v. Ashland*, 259 Iowa 728, 730, 145 N.W.2d 910, 911 (1966) (stating that "[t]he naming of pistols and revolvers followed by the words 'other dangerous weapon' clearly designates the listed items as dangerous weapons by statute"). Those activities would be considered sports only under a broad definition that equated a sport with a form of play or diversion. Snowmobiling is a sport in the sense that it is a form of physical activity engaged in for pleasure, not in the sense that it is a contest governed by forms, rules, or customs, like baseball or ice hockey.

This interpretation would not have led to awkward results at the time, because in 1971 only agricultural lands and appurtenant buildings, structures, machinery, and equipment were covered. In short, I conclude the legislature intended in 1971 to introduce some flexibility into the definition of "recreational purpose" that other states (which used the model act language) already had. In short, while our general assembly had elected not to use the model act's broader phrasing— "includes, but is not limited to"—in 1967, it nonetheless opened up the definition of "recreational purpose" in 1971 by making clear that other summer and winter sports would be covered.[13]

---

[13]The majority contends that construing "other summer and winter sports" as some kind of a catchall is inconsistent with the fact that the legislature later added trapping and all-terrain vehicle riding to the list of covered activities in section 461C.2(5). But the majority's own construction of "other summer and winter sports" as meaning "true outdoor sports" is subject to the same criticism. I think we should acknowledge the reality that groups often go to the legislature seeking a *specific*

Under a dictionary definition where "sport" means "a source of diversion: RECREATION" and "physical activity engaged in for pleasure," jumping in a hayloft clearly qualifies as a sport. *See Merriam-Webster's Collegiate Dictionary* 1134 (10th ed. 2002). It is true that the activities specifically identified in section 461C.2(5) are normally outdoor activities, but the legislature did not say that sports would only be covered when played outdoors. Frolicking in hay can be and frequently is an outdoor sport. The definition of "land" covers buildings that are appurtenant to covered land, and the inclusion of buildings would not have made sense if the legislature did not mean some indoor activities to be covered by the statute.[14]

Alternatively, my colleagues suggest that even if *the children* were embarked on a recreational purpose on May 18, 2010, *Sallee* was not. In other words, chaperoning a recreational activity is not itself a recreational purpose. However, it is sufficient in my view that Sallee was present to help with the class's recreational activity. For example, the Hawaii Supreme Court has found that the recreational use immunity applied to the claim of a paid scuba instructor who was injured while leading clients across hotel property after a dive. *Thompson v. Kyo-Ya Co.,* 146 P.3d 1049, 1057–58 (Haw. 2006). As the court put it, "[W]here the plaintiff's presence on the land is closely associated with the presence of individuals whose purpose on the land is purely recreational,

_____

statutory immunity even when a more general immunity already protects them. The important point here is that the majority's construction of "sports" is consistent with *neither* of the two common definitions of that term.

[14]Recognizing the fact that the statute does cover buildings, my colleagues concede that "under some circumstances activities within a building might give rise to immunity under the statute." Thus, they would presumably find that horseback riding inside a covered enclosure on a farm would be subject to the recreational use immunity. But why not jumping in a hayloft?

the recreational purpose attaches to the plaintiff." *Id.* at 1058. Quoting the trial court in that case, the court concluded that the plaintiff was "engaged in 'an activity in pursuit of the use of the property for recreational purposes.'" *Id.*; *see also Palmer*, 945 F.2d at 1137–38 (rejecting a grandparent's argument that he was not engaged in "recreation" because he was supervising his grandchildren who were swimming); *Ornelas v. Randolph*, 847 P.2d 560, 564 (Cal. 1993) (stating that "whether plaintiff entered the property to play on the equipment, or merely accompanied the other children at play, is immaterial"); *Hafford v. Great N. Nekoosa Corp.*, 687 A.2d 967, 968–69 (Me. 1996) (holding that Maine's recreational use statute applied to an outfitter who was injured while supplying canoeing and camping enthusiasts); *Fetherolf v. State*, 454 N.E.2d 564, 565–66 (Ohio Ct. App. 1982) (finding as a matter of law that the plaintiff who was injured while walking toward the beach with his three-year-old daughter was a recreational user, even though his shoulder injury prevented him from doing anything other than sitting and watching while his family swam). *But see Rintelman v. Boys & Girls Clubs of Greater Milwaukee, Inc.*, 707 N.W.2d 897, 904–06 (Wis. Ct. App. 2005) (finding that a chaperone was not engaged in a recreational activity when she fell moving from one building to another at a weekend retreat).[15]

Iowa's statute applies when there is an "entry or use by others for recreational purposes." Iowa Code § 461C.3. It applies to "persons entering for such purposes." *Id.* Simply stated, this language does not require that each person herself be enjoying the recreational activity so

---

[15]Here again, we are interpreting provisions (relevant portions of sections 461C.3 and 461C.4) that match the model act, so I believe out-of-state authorities are entitled to more weight than they otherwise would be. *Compare* Iowa Code §§ 461C.3, .4, *with* Council of State Governments, 24 Suggested State Legislation at 151.

long as her presence on the property is *in furtherance of* a recreational purpose. It would be a strange result if a farmer could let six-year-olds on his property for fun and enjoyment but had to shoo their adult chaperones away to avoid legal liability.

**IV. Does the Record Raise an Issue of a Willful or Malicious Failure to Guard or Warn Against a Dangerous Condition?**

Section 461C.6 removes any "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity" from the scope of the recreational use immunity. Sallee argues that she raised a genuine issue of material fact as to whether this exception applies, even if the Stewarts would otherwise be entitled to a recreational use immunity. The district court and the court of appeals disagreed, as do the majority and I.

This court has addressed this statutory provision once before. *See Bird v. Economy Brick Homes, Inc.*, 498 N.W.2d 408, 409 (Iowa 1993). In *Bird*, a motorcyclist struck a steel cable that had been placed across an access road. *Id.* at 408. "At the time of the accident, there were no markings on the cable to keep it from blending with its surroundings." *Id.* After discussing various other cases that had interpreted similar language, we concluded that the mere placement of an unmarked cable across an access road "did not create an issue of material fact as to whether Economy acted willfully or maliciously." *Id.* at 410.

The Stewarts had been allowing this kindergarten class to come for the past twenty-five years. During that entire time, the chute had been present in the hayloft. There is no evidence there had ever been an accident in the hayloft. "It's never been a concern," Matthew Stewart testified. The Stewarts insisted on being personally present for any visits by any groups. Matthew Stewart explained both the reason why there

was a chute in the loft (to allow hay to be thrown down occasionally), and the reason why the chute was covered (to keep the animals warmer).

This case does not fit within the circumstances where a willful or malicious failure to warn or guard has been found. In *Mandel v. United States*, cited by Sallee, the plaintiff was paralyzed from diving onto a submerged rock. 719 F.2d 963, 964–65 (8th Cir. 1983). Although the park rangers did not know of this specific rock, they knew of submerged rocks in the vicinity, knew that people swam there, and had brochures which warned people to be careful about diving; yet they failed to warn the plaintiff or post signs and instead told the plaintiff "that is where everybody goes and that is where we recommend for you to go." *Mandel*, 719 F.2d at 967. "It could reasonably be inferred and found that such conduct is the commission of an act with knowledge or appreciation that danger is likely to result therefrom." *Id.* at 968; *see also* 3 Louis A. Lehr, Jr., *Premises Liability 3d* § 54:41 (2012) ("Wilful conduct as an exception to statutory recreational use tort immunity consists of intentional acts of an unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm will result.").[16]

Additionally, the phrase "willful or malicious" as used in section 461C.6 ought be interpreted in tandem with the phrase "willful and wanton," as used in the punitive damage statute. *See* Iowa Code § 668A.1(1)(a). The latter standard means

> "[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."

---

[16]Here, Iowa's exception for a "willful or malicious failure to guard or warn" corresponds to that in the model act. *Compare* Iowa Code § 461C.6, *with* Council of State Governments, 24 Suggested State Legislation at 151.

*Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 396 (Iowa 2010) (quoting *McClure v. Walgreen Co.,* 613 N.W.2d 225, 230 (Iowa 2000)). That threshold has not been met here.

## V.  Is There a "Tour Guide" Exception?

Finally, Sallee argues that by guiding the group around the farm, including into the hayloft, the Stewarts performed a voluntary undertaking within the meaning of Restatement (Second) of Torts section 323 that is not covered by the recreational use immunity.[17] The district court rejected this argument. In her opening brief on appeal, Sallee renewed her section 323 argument. In her reply brief, she recast this argument into one based on section 7 of the Restatement (Third) of Torts. In that form, the court of appeals accepted it and on that basis reversed the district court's grant of summary judgment. Regardless of the Restatement box into which this argument falls, I do not believe there is a "tour guide" exception to the recreational use immunity in this case.[18]

---

[17]Restatement (Second) of Torts section 323 (1965) provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

[18]The majority does not reach this issue. The special concurrence does, stating that Sallee in effect brought a "negligent supervision" claim. This is simply wrong. A negligent supervision claim arises when an employer negligently supervises an employee, whose tortious or wrongful act then harms the plaintiff. *See Am. Family Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 112 (Iowa 2005) (noting that negligent supervision includes as an element an underlying tort or wrongful act committed by the person who was not properly supervised); *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004) (listing the elements of negligent supervision). Sallee does not allege that the Stewarts negligently supervised an employee whose tortious or wrongful act harmed her. Regardless, the proper focus should be on the language of sections 461C.3 and 461C.4(1) and whether they bar Sallee's claim, whatever nomenclature is used.

In *Scott v. Wright*, we found that the recreational use immunity did not bar a claim against the defendants based on the negligent driving of a tractor on their property. 486 N.W.2d 40, 42–43 (Iowa 1992). In that case, the plaintiff was seriously injured when she fell off a hay wagon that was being pulled by a tractor owned by the defendants and operated by their son-in-law. *Scott*, 486 N.W.2d at 41. In affirming a jury verdict in favor of the plaintiff, we reasoned that

> Scott's suit against Wrights rests—not on duties addressed by section 111C.3 [now section 461C.3]—but on vicarious liability for alleged negligence in the operation of a motor vehicle. We are convinced, as was the district court, that this intervening act of negligence takes the case outside the purview of chapter 111C.
>
> By its terms, section 111C.3 immunizes landowners from only two specific duties of care toward persons using agricultural property for recreational purposes: to keep the premises safe and to warn of dangerous conditions. Nothing in the language of chapter 111C suggests a legislative intent to immunize *all* negligent acts of landowners, their agents, or employees. Nor do we believe such broad application of the statute would serve the public purpose envisioned by the legislature. Though focused on reducing landowner liability, the statute was also enacted to serve "a growing need for additional recreation areas for use by our citizenry." Explanation to H.F. 151 at 3, 62nd G.A. (Iowa 1967). The public's incentive to enter and enjoy private agricultural land would be greatly diminished if users were subject, without recourse, to human error as well as natural hazards.
>
> Because the language of chapter 111C is couched in terms of premises liability, and the legislative history of the statute evinces no other motive for its passage, we are convinced the court correctly refused to apply it in this case.

*Id.* at 42.

Sallee contends that *Scott* stands for the proposition that she can sue over any "affirmative act" of negligence by the landowner. She also urges that *Scott* allows a party to sue when the claim is for "human error" as opposed to "natural hazards." *See id.* I do not read *Scott* so

broadly.[19]  *Scott* emphasized that the claim was not for premises liability, and therefore, it was not foreclosed by the statute.  *Id.*  *Scott*'s focus on the statutory language was appropriate.  The statute makes clear that except as provided in section 461C.6, a landowner "owes *no* duty of care to keep the premises safe for entry or use by others for recreational purposes . . . or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes."  Iowa Code § 461C.3 (emphasis added).  This language does not distinguish among duties derived from different sections of the Restatement or distinguish between active and passive negligence.  So long as the plaintiff's contention is that the landowner failed to keep the premises safe for entry or use, or failed to warn of a dangerous condition or structure, the action is barred if the other requirements of chapter 461C have been met and if section 461C.6 does not apply.  Scott's claim went forward because she was asserting negligent driving, not a failure to keep premises safe for entry or use or a failure to warn about a dangerous condition or structure.

Sallee's claim, however, has to do with the condition of the premises.  She alleges either that (1) the hayloft was not safe, (2) Stewart should have warned her about it, or (3) Stewart should not have encouraged the group to go there.  *See* Reply Brief for Appellant at 16 ("This required the Stewarts to exercise reasonable care, either to take precautions to fix dangers like the hole or not take them into dangerous areas or to warn them of any dangers like the hole.").  The first two of these claims fall squarely within section 461C.3.  I believe the third does as well.  If a landowner "owes no duty of care to keep the premises safe

---

[19]Obviously, *Bird* involved a case of alleged human error—stretching a cable across an access road and not warning about it.  *See* 498 N.W.2d at 408.

for entry or use by others for recreational purposes," *see* Iowa Code § 461C.3, it follows that the landowner does not breach a duty when he leads a group into an area whose safety he has no duty to maintain. This conclusion is reinforced by section 461C.4, which specifically provides that a holder of land "who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes or urban deer control does not thereby . . . [e]xtend any assurance that the premises are safe for any purpose." Iowa Code § 461C.4(1). The essence of Sallee's third theory is that by allegedly inviting her into the hayloft, Matthew Stewart implicitly assured her that it was safe for her use.

In *Klepper v. City of Milford*, the plaintiff tried unsuccessfully to rely on Restatement (Second) of Torts section 323 as an exception to the recreational use immunity. 825 F.2d 1440, 1448–50 (10th Cir. 1987).[20] That case involved a serviceman on weekend leave who was paralyzed after diving head first from a moored boat into murky but shallow water. *Klepper*, 825 F.2d at 1441–42. There was a sign warning against swimming but whether it was actually in place or had been dislodged was subject to dispute. *Id.* at 1442. Invoking section 323, the plaintiff argued the defendants had assumed a duty when they "undertook to erect a warning sign near the boat dock" and "undertook to make quarterly inspections." *Id.* at 1448–49. The United States Court of Appeals for the Tenth Circuit rejected the argument that such an "assumed duty" negated the statutory recreational use immunity, explaining as follows:

---

[20]Once again, this is an area where Iowa has adopted the model act language. *Compare* Iowa Code § 461C.3, *with* Council of State Governments, 24 Suggested State Legislation at 151.

> We agree with the district court that there is no compulsion under Kansas law to extend sections 323 and 324A of the Restatement to the RUS [statutory recreational use immunity] context. The RUS itself is a statutory modification of the common law of torts and provides for no liability for simple negligence. Instead, it provides for liability only where conduct is willful or malicious or where consideration is given in return for use of the recreational facilities. If the Kansas legislature had wanted to provide for additional exceptions, such as liability for negligent inspections, it could have so stated. To rule otherwise would have the effect of defeating the purpose of the RUS. As the United States points out, "If a negligent, gratuitous inspection results in liability, the requirement in the RUS for the higher standard for liability, i.e., willfulness or maliciousness, has been eliminated."

*Id.* at 1450. The Tenth Circuit's reading of the statute is logical, and the same logic should apply here. Our general assembly, like the Kansas legislature, provided that (subject to certain exceptions) landowners would have no duty "to keep the premises safe for entry or use by others for recreational purposes," or "to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." Iowa Code § 461C; Kan. Stat. Ann. § 58–3203 (2005). Whether the duty is "assumed" or "preexisting" does not factor into the analysis so long as the claimed breach of duty is precluded from being raised by the statute.

In *Palmer*, the United States Court of Appeals for the Ninth Circuit engaged in a similar analysis in overruling an argument based on the undertaking theory articulated in Restatement (Second) of Torts section 323. *See* 945 F.2d at 1137–38. The plaintiff, who slipped and fell while descending a flight of stairs at a swimming pool, urged that the defendant voluntarily undertook a duty of reasonable care "by hiring lifeguards, washing down the steps, and generally maintaining the pool area." *Id.* at 1137. The Ninth Circuit rejected this argument:

> Application of the HRUS [Hawaii recreational use immunity statute] precludes other theories of liability based upon mere negligence. Nothing in the language of the statute or its legislative history indicates that Hawaii intended the HRUS to apply only when the landowner fails to take any precautionary measures to ensure the safety of recreational users.

*Id.*; *see also Ervin v. City of Kenosha*, 464 N.W.2d 654, 657–660 (Wis. 1991) (rejecting the plaintiffs' claim that the negligence of lifeguards took the case outside the recreational use immunity based on a theory of "active negligence" or "gratuitous acts" and noting that if liability were imposed based on such a theory, "these facilities may not be provided").[21]

## VI. Conclusion.

To sum up: Iowa's recreational use law has always covered agricultural lands and appurtenant buildings, such as a barn. Jumping in hay is a sport in the same sense that other activities listed in section 461C.2(5) are sports, and in the same sense that the term was used in *City of Marion. See* 643 N.W.2d at 206–08. Jumping in hay is also an activity frequently engaged in outdoors. Although Sallee was not

---

[21]*Sena v. Town of Greenfield* is not on point because New York has a special rule for supervised municipal parks. *See* 696 N.E.2d 996, 999 (N.Y. 1998).

Sallee also argues that she has a claim against the Stewarts under Restatement (Second) of Torts section 310 (1965) ("Conscious Misrepresentation Involving Risk of Physical Harm"). That section provides:

> An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor
>
>   (a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and
>
>   (b) knows
>
>     (i) that the statement is false, or
>
>     (ii) that he has not the knowledge which he professes.

I agree with the Stewarts that Sallee has not shown an affirmative misrepresentation. Accordingly, I would not reach the question whether chapter 461C would bar such a claim in any event.

jumping in the hay herself, she was there as a chaperone to serve the overall recreational purpose.  Finally, this is a premises liability case where the alleged duty sought to be imposed is foreclosed by sections 461C.3 and 461C.4(1).

Notwithstanding its extensive citations to historical materials, law review articles, and other states' laws, I think the majority opinion misses the essential point: Our recreational use law protects farmers who want to open up their farm properties so others can play there for free.  At least it did so until today.

I respectfully dissent and would affirm the judgment of the district court in its entirety.

Waterman, J., joins this dissent.